**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **IN RE:  TESTOSTERONE REPLACEMENT THERAPY PRODUCTS LIABILITY LITIGATION** | : : : : : : | **MDL 2545**<br><br>**Master Case No. 1:13-cv-01748**<br><br>**HONORABLE MATTHEW F. KENNELLY** |
| **THIS DOCUMENTS RELATES TO:** | : : | |
| *Brad Martin, et al. v. Actavis, Inc., et al.*, Case No. 15-cv-4292 | : : : | |
| and | : : | |
| *Casey Brubaker, et al. v. Actavis, Inc.* Case No. 15-cv-0426 | : : : : | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS ACTAVIS, INC.; ACTAVIS**
**PHARMA, INC.; AND ACTAVIS LABORATORIES UT, INC.'S**
**MOTION FOR SUMMARY JUDGMENT BASED ON FEDERAL PREEMPTION**

# TABLE OF CONTENTS

I.    FEDERAL REGULATION OF PHARMACEUTICAL PRODUCTS ............................. 1

    A.    NEW DRUG APPROVAL PROCESS ........................................................... 1

    B.    LABELING REQUIREMENTS FOR NEW DRUGS ........................................... 1

    C.    THE POST-APPROVAL PROCESS AND LABELING CHANGES ........................ 2

II.    ANDRODERM ............................................................................................. 3

III.    LAW AND ARGUMENT ............................................................................... 4

    A.    THE SUPREMACY CLAUSE, WYETH V. LEVINE, PLIVA, INC. V. MENSING, AND MUTUAL PHARM. CO., INC. V. BARTLETT ........ 4

    B.    PLAINTIFFS' DESIGN DEFECT CLAIMS ARE PREEMPTED BY FEDERAL LAW ........... 6

    C.    PLAINTIFFS' FAILURE-TO-WARN CLAIMS ARE PREEMPTED ................................... 8

        1.    Defendants Could Not Independently Change the Androderm Package Insert ................................... 8

        2.    Plaintiffs Do Not Identify "Newly Acquired Information" That Would Support A Label Change ................................... 10

    D.    CLAIMS OF OFF-LABEL PROMOTION ARE PREEMPTED ........................................... 14

III.    CONCLUSION ............................................................................................. 15

# TABLE OF AUTHORITIES

## Cases

*Amos v. Biogen IDEC, Inc.*,
  2014 WL 2882104 (W.D.N.Y. Oct. 10, 2014) ......................................................... 8

*Barcal v. EMD Serono, Inc.*,
  No. 5:14-cv-01709- MHH, 2016 WL 1086028 (N.D. Ala. 2016) ................................... 6, 7, 8

*Blankenship v. Medtronic, Inc.*,
  6 F. Supp. 3d 979 (E.D. Mo. 2014) ........................................................................ 15

*Booker v. Johnson & Johnson*,
  2014 WL 5113305 (N.D. Ohio Oct. 10, 2014) .......................................................... 8

*Brady v. Medtronic, Inc.*,
  Case No. 13-cv-62199-RNS, 2014 WL 1377830 (S.D. Fla. Apr. 8, 2014) ...................... 15

*Brinkley v. Pfizer, Inc.*,
  772 F.3d 1133 (8th Cir. 2014) ............................................................................... 7

*Buckman Co. v. Plaintiffs' Legal Comm.*,
  531 U.S. 341 (2001) ............................................................................................ 14

*Caplinger v. Medtronic, Inc.*,
  921 F. Supp. 2d 1206 (W.D. Okla. 2013) ................................................................. 15

*Fleming v. Janssen Pharm., Inc.*,
  2016 WL 3180299 (W.D. Tenn. 2016) ..................................................................... 8

*Hafer v. Medtronic, Inc.*,
  99 F. Supp. 3d 844 (W.D. Tenn. 2015) .................................................................... 15

*Houston v. Medtronic, Inc.*,
  957 F. Supp. 2d 1166 (C.D. Cal. 2013) ................................................................... 15

*In re: Celexa and Lexapro Marketing and Sales Practices Litig.*,
  779 F.3d 34 (1st Cir. 2015) ................................................................................... 10

*M'Culloch v. Maryland,*
  17 U.S. (4 Wheat) 316, (1819) ............................................................................... 5

*Markland v. Insys Therapeutics, Inc.*,
  270 F. Supp. 3d 1318 (M.D. Fla. 2017) ................................................................... 15

*Maryland v. Louisiana,*
  451 U.S. 725 (1981) ............................................................................................ 5

*Mitchell v. Boehringer Ingelheim Pharms.*,
   No. 1:16-cv-02384-STA-egb, 2017 WL 5617473 (W.D. Tenn. Nov. 21, 2017) .................... 10

*Mutual Pharm. Co., Inc. v. Bartlett*,
   133 S. Ct. 2466 (2013) .......................................................................................... 6, 10

*PLIVA, Inc. v. Mensing*,
   564 U.S. 604 (2011) ......................................................................................... 5, 6, 10

*Rheinfrank v. Abbott Labs., Inc.*,
   137 F. Supp. 3d 1035 (S.D. Ohio 2015) ......................................................................... 8

*Seufert v. Merck Sharp & Dohme Corp.*,
   187 F. Supp. 3d 1163 (S.D. Cal. 2016) ......................................................................... 11

*Shah v. Forest Laboratories, Inc.*,
   2015 WL 3396813 (N.D. Ill. May 26, 2015) .................................................................... 8

*Utts v. Bristol-Myers Squibb Co.*,
   251 F. Supp. 3d 644 (S.D.N.Y. 2017)........................................................................ 8, 10

*Wyeth v. Levine*,
   555 U.S. 555 (2009).................................................................................................. 5

*Yates v. Ortho-McNeil-Janssen Pharm., Inc.*,
   808 F.3d 281 (6th Cir. 2015) ...................................................................................... 7

**Statutes**

21 U.S.C. §§301 ............................................................................................................ 1

21 U.S.C. §321(k) .......................................................................................................... 1

21 U.S.C. §321(m) ......................................................................................................... 1

21 U.S.C. §337(a) ......................................................................................................... 14

21 U.S.C. §355(a) .......................................................................................................... 1

21 U.S.C. §355(b) .......................................................................................................... 1

21 U.S.C. §371 .............................................................................................................. 1

21 U.S.C. §393 .............................................................................................................. 1

**Regulations**

21 C.F.R. §1.3 ............................................................................................................... 1

21 C.F.R. 202.1 ............................................................................................................ 14

21 C.F.R. §201.56 ................................................................................................. 1, 2

21 C.F.R. §201.57 ................................................................................................. 1

21 C.F.R. §201.70(b) ............................................................................................ 3

21 C.F.R. §202.1(l)(2) ........................................................................................... 1

**Constitutional Provisions**

U.S. Const. art. VI, cl. 2 ....................................................................................... 5

**Other Authorities**

*Requirements on Content and Format of Labeling for Human Prescription Drugs and Biologics: Requirements for Prescription Drug Product Labels – Proposed Rule,*
65 Fed. Reg. 81082 (Dec. 22, 2000) ................................................................ 2

*Supplemental Applications Proposing Labeling Changes for Approved Drugs, Biologics, and Medical Devices – Proposed Rule,*
73 Fed. Reg. 2848 (Jan. 16, 2008) ................................................................... 3

*Supplemental New-Drug Applications,*
30 Fed. Reg. 993 (Jan. 30, 1965) ..................................................................... 3

## I.     FEDERAL REGULATION OF PHARMACEUTICAL PRODUCTS

### A.     NEW DRUG APPROVAL PROCESS

Prescription drugs are regulated under the Federal Food, Drug, and Cosmetic Act ("FDCA"), which is implemented and enforced by the federal Food and Drug Administration ("FDA"). *See* 21 U.S.C. §301 *et seq.*; *id.,* §§371, 393. A drug may not be marketed in interstate commerce unless an application pursuant to 21 U.S.C. §355 is "effective"; i.e., has been approved by FDA. *See* 21 U.S.C. §355(a). Section 355(b) applies to new drugs, like Androderm®, and requires submission of a new drug application ("NDA"). An NDA review involves all aspects of the drug "from the design of clinical trials to the severity of side effects to the conditions under which the drug is manufactured." *See* FDA's Drug Review Process: Ensuring Drugs Are Safe and Effective.[1] NDA applicants must demonstrate the new drug is safe and effective for the proposed use before approval is granted. *See* 21 U.S.C. §355(b)(1)(A).

### B.     LABELING REQUIREMENTS FOR NEW DRUGS

"Labeling" includes "all labels and other written, printed, or graphic matters (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." 21 U.S.C. §321(m).[2] "Label" is defined as "a display of written, printed, or graphic matter upon the immediate container of any article...." 21 U.S.C. §321(k); *see also* 21 C.F.R. §1.3. FDA's regulations govern the content and format of drug labeling. *See* 21 C.F.R. §§201.56 (general requirements), 201.57 (specific requirements). The title and content of each section required to appear in drug labeling is specified in FDA's regulations.

In 2006, FDA amended its labeling regulations, 21 C.F.R. §§201.56, 201.57, to implement the "Physician Labeling Rule." The package insert now consists of two parts, the

---

[1]Available at http://www.fda.gov/Drugs/ResourcesForYou/Consumers/ucm143534.htm.
[2]In 21 C.F.R. §202.1(l)(2), FDA expanded the definition of labeling.

"Highlights" section and the "Full Prescribing Information" section. The content, including the order in which information appears in both parts, is mandated by FDA regulations. *Id.* The "Highlights" section must include the product name, boxed warning, recent major changes, indications and usage, dosage and administration, dosage forms and strength, contraindications, warnings and precautions, adverse reactions, drug interactions, and use in specific populations – in that order. *See* 21 C.F.R. §201.56(d)(1); §201.57(a)(1). The Highlights section is intended to spotlight information in drug labeling and improve the accessibility, readability, and usefulness of information in prescription drug labeling. *See Requirements on Content and Format of Labeling for Human Prescription Drugs and Biologics: Requirements for Prescription Drug Product Labels – Proposed Rule*, 65 Fed. Reg. 81082 (Dec. 22, 2000).

The "Full Prescribing Information" section includes the same categories of information in greater detail. *See* 21 C.F.R. §201.56(d)(1); §201.57(b). In addition, it includes sections that address drug use and dependence, overdosage, clinical pharmacology, nonclinical toxicology, clinical studies, references, how the product is supplied and stored, as well as handling instructions and patient counseling information. 21 C.F.R. §201.56(d)(1); §201.57(b).

## C. THE POST-APPROVAL PROCESS AND LABELING CHANGES

No provision in the FDCA permits a manufacturer to change an approved drug's labeling without prior FDA approval. *See* 21 U.S.C. §301 *et seq.* Any unapproved label change renders the drug a new, unapproved drug under the FDCA subject to the misbranding provisions. *See id.* Accordingly, under the FDCA, any change to an approved application must be approved by FDA prior to its implementation. Despite that requirement, FDA issued a notice advising industry that it would exercise its discretion and not take enforcement action if NDA holders instituted labeling changes before approval: (i) to add or strengthen a contraindication, warning, precaution, or adverse reaction; (ii) to add or strengthen a statement about drug abuse,

2

dependence, or overdosage; (iii) to add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product; or (iv) to delete unsupported indications for use or claims of effectiveness. *See* 21 C.F.R. §314.70(c); *Supplemental New-Drug Applications*, 30 Fed. Reg. 993, 993-94 (Jan. 30, 1965). Those changes are made using FDA's "changes being effected" ("CBE") procedure and must be based on "newly acquired information" and "sufficient evidence of a causal association with the drug." *See* 21 C.F.R. §314.70(c)(6)(iii)(A); *Supplemental Applications Proposing Labeling Changes for Approved Drugs, Biologics, and Medical Devices – Proposed Rule*, 73 Fed. Reg. 2848, 2849 (Jan. 16. 2008). ). CBE supplements must include the "newly acquired information" supporting the change and must be submitted to FDA for ultimate approval. 21 C.F.R. §314.70(c)(7). FDA can accept, modify, or reject a CBE supplement. *Id.* All other changes must be implemented through a prior approval supplement ("PAS"). 21 C.F.R. §314.70.

An NDA holder may not make any changes to the Highlights section of the label without prior FDA approval. *See* 21 C.F.R. §201.70(b)(2)(v)(C).

## II. ANDRODERM

Androderm® is a testosterone transdermal system approved by FDA on September 29, 1995.[3] It is indicated for replacement therapy in males for conditions associated with a deficiency or absence of endogenous testosterone. The initial approval was for a 2.5 mg strength. On October 25, 1996, FDA approved a supplemental NDA ("sNDA") for a 5 mg strength. Andorderm's labeling on September 29, 1995, tracked FDA's 1981 class labeling guidance for androgen products. On October 20, 2011, FDA approved a supplemental NDA

---

[3]The NDA was submitted by Theratech, Inc., on September 29, 1994. After it was acquired by Watson Pharmaceuticals, Inc., in 1999, Theratech, Inc., changed its name to Watson Laboratories, Inc. After the transaction between Watson Pharmaceuticals, Inc., and Actavis Group that closed in October 2012, Watson Laboratories, Inc., changed its name to Actavis Laboratories UT, Inc.

("sNDA") for two new strengths of Androderm, a 2 mg/day patch and 4 mg/day patch.[4] That

approval included a change to the labeling to comply with the Physician Labeling Rule.

During the time plaintiffs used Androderm, the FDA-approved package insert read:

Male hypogonadism results from insufficient secretion of testosterone and is characterized by low serum testosterone concentrations. Signs/symptoms associated with male hypogonadism include erectile dysfunction and decreased sexual desire, fatigue and loss of energy, mood depression, regression of secondary sexual characteristics, and osteoporosis.

(Androderm Package Insert, Rev. 4/2012, 12.1, Ex. 9.[5])  In 2015, there was a revision to add a

warning about myocardial infarctions:

• Some postmarketing studies have shown an increased risk of myocardial infarction and stroke associated with the use of testosterone replacement therapy.  (5.4)

(Androderm Package Insert, Rev. 5/2015, Ex. 10.)  A corresponding change was made in section

5.4 of the Full Prescribing Information:

**5.4 Cardiovascular Risk**

Long term clinical safety trials have not been conducted to assess the cardiovascular outcomes of testosterone replacement therapy in men. To date, epidemiologic studies and randomized controlled trials have been inconclusive for determining the risk of major adverse cardiovascular events (MACE) such as non-fatal myocardial infarction, non-fatal stroke, and cardiovascular death, with the use of testosterone compared to non-use. Some studies, but not all, have reported an increased risk of MACE in association with use of testosterone replacement therapy in men. Patients should be informed of this possible risk when deciding whether to use or continue to use ANDRODERM.

## III.    LAW AND ARGUMENT

### A.    THE SUPREMACY CLAUSE, *WYETH V. LEVINE*, *PLIVA, INC. V. MENSING*, AND *MUTUAL PHARM. CO., INC. V. BARTLETT*

The United States Constitution provides that the laws of the United States "shall be the

---

[4]The labeling approved by FDA on October 20, 2011, included information not only about the new 2 mg and 4 mg strengths, but also about the 2.5 and 5 mg strengths. On October 24, 2011, an sNDA was submitted to discontinue the 2.5 and 5 mg strengths and update the Androderm labeling to reflect the discontinuation. FDA approved that sNDA, including the updated labeling, on April 26, 2012.

[5] All "Ex." references are to the Exhibits attached to the Declaration of Jeffrey D. Geoppinger ("Geoppinger Dec") unless otherwise noted.

supreme Law of the Land; …any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. As such, state law that conflicts with federal law is "without effect." *See Maryland v. Louisiana*, 451 U.S. 725, 746 (1981); *M'Culloch v. Maryland*, 17 U.S. (4 Wheat) 316 (1819).

In recent years, the United States Supreme Court addressed preemption in lawsuits aimed at pharmaceutical products on three occasions. The first, *Wyeth v. Levine*, 555 U.S. 555 (2009), involved preemption of state-law claims involving pharmaceutical products approved through an NDA. The Court, pointing to FDA's CBE process, held it was not impossible for Wyeth to satisfy both its state law duty to provide adequate warnings and its duties under federal law. It did so, however, only because newly acquired information existed that could have supported a CBE to change one or more of the label sections specified in 21 C.F.R. §314.70(c)(6). The Court acknowledged, however, that ultimately FDA must approve the change and FDA retains authority to reject the change. *Id*. Although the Court held that the plaintiff's claims in *Levine* were not preempted, it ruled that claims against an NDA holder are preempted where "clear evidence" shows FDA would not have approved a change to the drug's label, rendering it impossible for the manufacturer to comply with both state and federal law. *Id*. at 571-72.

Two years later, the Supreme Court again addressed preemption of claims against pharmaceutical manufacturers in *PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011). In that case, the Court addressed claims involving generic drugs approved under an abbreviated new drug application ("ANDA"). While the *Mensing* Court acknowledged that the federal requirements applicable to NDA drugs differ from those applicable to ANDAs, the Court was clear that the "question for 'impossibility' preemption is whether the private party could independently do under federal law what state law requires of it." *Id*. at 620 (emphasis added) (*citing Levine*, 555 U.S. at 573). If not, the state law is preempted.

Two years after *Mensing*, the Supreme Court decided *Mutual Pharm. Co., Inc. v. Bartlett*, 133 S. Ct. 2466 (2013). In *Bartlett*, the Court reiterated its holding in *Mensing* and also held that state-law design defect claims aimed at pharmaceutical products are preempted. With respect to the design defect claim, the Court found that "[i]n the drug context, either increasing the "usefulness" of a product or reducing its "risk of danger" would require redesigning the drug." *Id*. at 2475. It held design defect claims are preempted because legally a drug may not be changed without FDA's prior approval. *Id*.

The holdings in *Mensing* and *Bartlett* apply equally to drugs approved under an ANDA or an NDA. Following *Levine*, *Mensing*, and *Bartlett*, it is clear that "when a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for pre-emption purposes." *Mensing*, 465 U.S. at 623-24.

## B.    PLAINTIFFS' DESIGN DEFECT CLAIMS ARE PREEMPTED BY FEDERAL LAW

Federal law preempts plaintiffs' design defect claims. "Once a drug—whether generic or brand-name—is approved, the manufacturer is prohibited from making any major changes to the 'qualitative or quantitative formulation of the drug product, including active ingredients, or in the specifications provided in the approved application.'" *Bartlett*, 133 S. Ct. at 2471 (quoting 21 C.F.R. §314.70(b)(2)(i)). A design defect theory would require a redesign of Androderm. That is precisely the kind of impossibility that led the Supreme Court to find preemption. As the *Bartlett* Court definitively stated, "we hold that state-law design-defect claims … that place a duty on manufacturers to render a drug safer by either altering its composition or altering its labeling are in conflict with federal laws that prohibit manufacturers from unilaterally altering drug composition or labeling." *Id*. Importantly, a hypothetical supposition that the "FDA may approve an alteration does not negate the present impossibility." *Barcal v. EMD Serono, Inc.*,

No. 5:14-cv-01709- MHH, 2016 WL 1086028, *4 (N.D. Ala. 2016).

In *Brinkley v. Pfizer, Inc.*, 772 F.3d 1133, 1139-1140 (8th Cir. 2014), the Eighth Circuit Court of Appeals affirmed the dismissal of a design defect claim holding that federal law preempts a state law that would require the manufacturer to redesign its drug. "Since *Bartlett*, there is a growing consensus in the federal circuit courts that the preemption analysis in *Mensing* and *Bartlett* proves fatal to state law claims like [the plaintiff's]." *Id*. (citations omitted).

The court in *Yates v. Ortho-McNeil-Janssen Pharm., Inc.*, 808 F.3d 281 (6th Cir. 2015), likewise found the plaintiff's design defect claim preempted. The plaintiff in *Yates* had a stroke after using a birth control patch and sued the brand-name manufacturers for various claims under New York law, including defective design. *Id*. at 287-88. The plaintiff contended that, even after FDA approved the medication, the defendant had a duty to change the design of the medication once it discovered that it was unreasonably dangerous. *Id*. at 297-98. After careful analysis, the court rejected the plaintiff's arguments and held that federal law expressly prohibited the defendants from complying with New York's design defect law. *Id*. at 297-300.

> FDA regulations provide that once a drug, whether generic or brand-name, is approved, the manufacturer is prohibited from making any major changes to the "qualitative or quantitative formulation of the drug product, including inactive ingredients, or in the specifications provided in the approved application."

*Id*. (quoting 21 C.F.R. §314.70(b)(2)(i)). The Sixth Circuit held that the plaintiff's "design defect claim is clearly preempted by federal law." *Id*. at 298.

Other courts agree. For example, in *Barcal*, the plaintiff alleged that her mother's use of the fertility medication Serophene caused her to be born with a severe cardiac birth defect. *Barcal*, 2016 WL 1086028, at *1. The court held that the plaintiff's design defect claim was preempted because the state law claim "would essentially require [the defendant] to redesign Serophene." *Id*. at *3, 4. "This is precisely the kind of impossibility in which the Supreme

7

Court has found preemption." *Id*. FDA-approved medicines "cannot be altered without the FDA's prior permission, rendering compliance with both state and federal law impossible." *Id*.[6]

A design change to Androderm would require FDA-approval. As it is impossible to redesign the product without violating federal law, design defect claims are preempted.

## C. PLAINTIFFS' FAILURE-TO-WARN CLAIMS ARE PREEMPTED

### 1. Defendants Could Not Independently Change the Androderm Package Insert

The April 2012 package insert is the relevant label here. It was the last revised, FDA-approved label before Mr. Brubaker's prescription in December 2013 and Mr. Martin's prescription in October 2012. And, the simple fact is that the Androderm labeling cannot be changed independently to include different or additional language where the change requires a change to the Highlights section of the label because all changes to Highlights require FDA's pre-approval. *See* 21 C.F.R. §314.70(b)(2)(v)(C). In turn, if a change to Full Prescribing Information section requires a corresponding change to Highlights, the Full Prescribing Information section also cannot be changed independently. Here, what plaintiffs propose would have required a change to both.

Plaintiffs allege myocardial infarctions (MI) from their use of Androderm. Plaintiffs' failure-to-warn claim is that the language FDA approved for addition to the Androderm labeling in May 2015 should have been in the Androderm labeling when they were prescribed testosterone replacement therapy ("TRT").

Specifically, plaintiffs assert that the language FDA approved for addition to the

---

[6] *See also, e.g., Shah v. Forest Laboratories, Inc.*, 2015 WL 3396813 (N.D. Ill. May 26, 2015) (holding design defect claim preempted); *Utts v. Bristol-Myers Squibb Co.,* 251 F. Supp. 3d 644 (S.D.N.Y. 2017) (same); *Fleming v. Janssen Pharm., Inc.*, 2016 WL 3180299, *4-5 (W.D. Tenn. 2016) (same); *Rheinfrank v. Abbott Labs., Inc.*, 137 F. Supp. 3d 1035, 1040-41 (S.D. Ohio 2015) (same);; *Booker v. Johnson & Johnson*, 2014 WL 5113305 (N.D. Ohio Oct. 10, 2014) (same); *Amos v. Biogen IDEC, Inc.*, 2014 WL 2882104, *3 (W.D.N.Y. Oct. 10, 2014) (same).

Androderm package insert on May 11, 2015, regarding inconclusive results of studies for determining the risk of major adverse cardiovascular events ("MACE") and informing patients of "this possible risk" should have appeared in the Androderm package insert in October 2012. The addition of subsection 5.4 in the Full Prescribing Information on May 11, 2015, resulted in a change to the Highlights section as well where the following language was included: "Some postmarketing studies have shown an increased risk of myocardial infarction and stroke associated with the use of testosterone replacement therapy. (5.4)." (Androderm Package Insert, Rev. 5/2015.)

On May 11, 2015, FDA also approved the addition of a "Limitation of Use" to the "Indications and Usage" section of the Androderm label stating that safety and efficacy in men with "age-related hypogonadism" have not been established. (Androderm Package Insert, Rev. 5/2015, §1.) A corresponding change was made in Highlights: "Safety and efficacy of ANDRODERM in men with "age-related hypogonadism" have not been established. (1)."[7] (*Id.*)

The Highlights section must reflect the same information as the Full Prescribing Information. *See* 21 C.F.R. §201.57(a). Because the cardiovascular risk, and the Limitation of Use language added in 2015 appeared not only in the Full Prescribing Information, but also in Highlights, those changes *could not* have been made using a CBE. "Highlights" can be changed *only* with prior FDA approval and "Highlights" and "Full Prescribing Information" must reflect the same information. As a result, any change to "Full Prescribing Information" required FDA's prior approval.[8] Because FDA's prior approval was required, plaintiffs' claims are preempted.

---

[7] The 2015 label changes were made in the same time frame to the other TRT products as class labeling changes.

[8] The 2015 changes to the label were required by FDA and, for each change, FDA told the sponsors the exact language to use. FDA instructed the sponsors to submit the sNDAs for the changes as prior approval supplements. To the extent plaintiffs may seek to base any claim on the Limitation of Use addition in 2015, it is notable that FDA revised the language <u>after</u> its original letters setting forth the exact

## 2. Plaintiffs Do Not Identify "Newly Acquired Information" That Would Support A Label Change

Plaintiffs' warning-based claims also are preempted due to plaintiffs' failure to identify "newly acquired information" that would have supported submission of a CBE to change the Androderm label between April 26, 2012 (the last date FDA approved a change to Androderm's label before plaintiffs were prescribed TRT) and the date of their first prescriptions[9] that would have supported a CBE supplement even if the changes did not impact the Highlights section.

In *In re: Celexa and Lexapro Marketing and Sales Practices Litig.*, 779 F.3d 34 (1st Cir. 2015), the court applied the Supreme Court's preemption trilogy which hold that a state-law claim is preempted where the company cannot act independently under federal law to do what state law requires. *Id*. at 44 (*citing Mensing*, 564 U.S. at 623-24; *Bartlett*, 133 S. Ct. 2466). The First Circuit recognized that an NDA holder can use FDA's CBE supplement process to change product labeling only where "newly acquired information" becomes available supporting certain changes to certain sections of product labeling. *Celexa*, 779 F.3d at 37; *see also* 21 C.F.R. §314.70(c)(6). As a result, the court concluded that a plaintiff must allege, in the first instance, what "newly acquired information" warrants the label change the plaintiff advocates. The court ruled that the plaintiffs did not overcome the preemptive effect of federal law because the plaintiffs did not allege any "newly acquired information" existed that would have supported an independent label change the company could have made. *Id*. at 42-43. Other courts are in accord. *See, e.g., Utts*, 251 F. Supp. 3d 644; *Mitchell v. Boehringer Ingelheim Pharms.*, No. 1:16-cv-02384-STA-egb, 2017 WL 5617473 (W.D. Tenn. Nov. 21, 2017).

Changes to Full Prescribing Information using a CBE supplement are limited to those

---

changes to be made to the Androderm package insert. The language eventually required and approved by FDA was different from the language it originally mandated.

[9] Mr. Brubaker's first prescription was filled in December 2013. Mr. Martin's first prescription was filled in October 2012.

based on "newly acquired information" that supports a change to

- add or strengthen a contraindication, warning, precaution, adverse reaction;
- a statement about drug abuse, dependence, or overdosage;
- an instruction about dosage and administration that is intended to increase the safe use of the drug product; or
- that would delete false, misleading, or unsupported indications for use or claims for effectiveness.

*See* 21 C.F.R. §314.70(c)(6)(iii); *see also Seufert v. Merck Sharp & Dohme Corp.*, 187 F. Supp. 3d 1163, 1176 (S.D. Cal. 2016) (acknowledging CBE can be used to make label change "only when submission is supported by sufficient scientific data"). Without any "newly acquired information" to support submission of a CBE, any change to a pharmaceutical product's label must be accomplished through FDA's prior approval process (unless the change falls within the categories FDA delineated as reportable in the company's annual report).

Plaintiffs have not identified any *new* safety information that existed after April 26, 2012, and before they received their first prescriptions to support a label change to Androderm's "Full Prescribing Information." Indeed, quite the contrary, plaintiffs contend that the information that should have prompted the MACE warning was known in 2007.[10] (Peggy Pence, Ph.D., RAC, FRAPS Dep. ("Pence Dep."), pp. 190-95.) Plaintiffs also contend it was known since initial approval that Androderm had not been tested in men with "age-related" hypogonadism and that safety and efficacy of Androderm in those men had not been established. (Pence Dep., pp. 195-96.)

---

[10] Dr. Pence opined at her deposition (but not in her report) that the Calof, Haddad, and Gruenewald meta-analyses provided reasonable evidence of a casual association sufficient to warn of cardiovascular risk in 2007. Pence Dep. 190-195. Not only were those studies not new in 2012, those specific studies had been scrutinized by FDA in 2010 with FDA concluding "the results regarding overall cardiovascular risk associated with TRT compared to placebo **are consistent and do not** support an association between TRT and increased risk of cardiovascular events in men." (May 21, 2010, Memorandum from FDA's Division of Epidemiology to FDA's Division of Reproductive and Urologic Products, Ex. 13.) FDA concluded the meta-analyses upon which Dr. Pence relies "add[ed] to existing evidence in support of **no causal association** between TRT in men and increased risk of cardiovascular disease overall."

To the extent plaintiffs may seek to base any claim on the addition of the Limitation of Use in 2015, plaintiffs also do not allege that addition was based on newly acquired information after April 26, 2012. To the contrary, plaintiffs allege that the language added under "Limitation of Use," which in the "Indications and Usage" section of the Androderm package insert, reflects information that was known since the date FDA approved Androderm on September 29, 1995. Defendants disagree with that assertion for myriad reasons. For purposes of this motion, however, the critical point is that plaintiff will not and cannot provide evidence that the added "Limitation of Use" language was based on any newly acquired information after April 26, 2012.

There are additional reasons why a CBE could not be used for the MACE label change plaintiffs advocate. A warning can be added via CBE only when the evidence shows a causal association. *See* 21 C.F.R. §314.70(c)(6)(iii)(A). Under 21 C.F.R. §201.57(c)(6), warnings about clinically significant hazards are added to labeling when there is "reasonable evidence of a causal association with a drug." The MACE language FDA added on May 11, 2015, specifically disclaims "reasonable evidence of a causal association" between major adverse cardiovascular events and Androderm:

> To date, epidemiologic studies and randomized controlled trials have been inconclusive for determining the risk of major adverse cardiovascular events (MACE) such as non-fatal myocardial infarction, non-fatal stroke, and cardiovascular death, with the use of testosterone compared to non-use.

(Androderm Package Insert, Rev. 5/2015, 5.4, Ex. 10.) The MACE language FDA required in 2015 was after FDA's assessment of cardiovascular risk for TRT products in response to a citizen's petition submitted by Public Citizens in February 2014. FDA denied that citizen's petition in July 2014, noting:

> Observational studies have shown that generally low testosterone in men is associated with the worsening of biomarkers of cardiovascular health, such as the progression of atherosclerosis, high cholesterol, and high blood pressure. There is a growing body of evidence regarding the association between low baseline testosterone and poor

cardiovascular health in men. Some studies have attempted to assess the relationship between low testosterone and adverse clinical outcomes such as myocardial infarction (MI) and cardiovascular mortality, but it remains unclear. Randomized controlled trial have shown that testosterone supplementation generally improves some biomarkers of cardiovascular health.

FDA Response to Citizen's Petition, Ex. 14 (citations omitted).) FDA then explained:

FDA has considered the studies submitted in support of your requests, which were all known to the Agency prior to the submission of your Petition, and concludes that, at this time, there is insufficient evidence of a causal link between testosterone therapy and adverse cardiovascular outcomes to support the regulatory actions requested in your Petition. However, prior to the submission of your Petition, the Agency had already initiated its own evaluation of the cardiovascular risks of testosterone therapy. The Agency's final determination regarding the safety of testosterone therapy, and whether FDA will exercise its authority to require safety labeling changes to the labeling of testosterone-containing drugs, is pending the outcome of that evaluation.

*Id.* The Vigen, Xu, Finkle, and Basaria studies upon which plaintiffs rely all were analyzed and specifically discussed by FDA in its refusal to require a cardiovascular risk warning in July 2014. FDA's July 2014 conclusion included the period during which plaintiffs were prescribed Androderm and demonstrates that during that period there was not "reasonable evidence of a causal association" as required for an independent CBE change.[11] Therefore, defendants could not have added the MACE language to Androderm's package insert unilaterally using a CBE because, as the language FDA wrote makes clear, there was not (and is not) reasonable evidence of a causal association and the requirements for adding a warning utilizing a CBE are not met.

Defendants could not have added the Limitation of Use language using a CBE because it does not fit within any of the categories for a CBE. The language did not add or strengthen a contraindication, warning, precaution, adverse reaction. It is not a statement about drug abuse,

---

[11] Defendant's data did not support a possible signal, let alone an association. Following receipt of FDA's February 9, 2015, letter requiring the addition of the cardiovascular risk and imposing the postmarketing requirement ("PMR") for the MACE study, Actavis Utah searched and analyzed the adverse event reports it had received for reports of MACE. It found that between 2000 and the end of 2013, prior to FDA's January 31, 2014, Safety Announcement and the start of the wave of lawsuits approximately five days later, defendants had received a total of two MACE reports, both in 2001. Feigal Dec., Ex. A, p. 40, n.96.

dependence, or overdosage. It is not an instruction about dosage and administration that is intended to increase the safe use of the drug product. And, the language does not appear in any of those sections of the Androderm package insert, it appears in the "Indications and Usage" section. Further, the language does not delete an indication or claim of effectiveness. Indeed, plaintiff asserts that "age-related" hypogonadism never was within the indication for Androderm. As discussed earlier, that assertion is incorrect, but the assertion demonstrates why, under plaintiffs' theory, the Limitation of Use language could not be added through a CBE. Specifically, plaintiff cannot contend that age-related hypogonadism was deleted from the indication while at the same time contending it was never part of the indication in the first place.

Plaintiffs must, but have not and cannot, demonstrate the existence of "newly acquired information" after April 2012 and before their first prescriptions that would have supported a CBE. As a result, any claim premised on a failure to make a change is preempted.

D. CLAIMS OF OFF-LABEL PROMOTION ARE PREEMPTED

Plaintiffs allege Andoderm was promoted to entice them to ask for and their physicians to prescribe and use Androderm off-label. To the extent, plaintiff are attempting to pursue a claim based on those allegations, the claim cannot survive as it too is preempted.

The very concept of off"-label" use or promotion is born from the FDCA. It is only because of the FDCA's existence and its requirements that pharmaceutical products be approved for particular indications, that a use can be "off label." Viewed through that prism, plaintiffs' claims are easily distilled: They are attempting to enforce provisions of the FDCA which restrict the promotion and sale of pharmaceutical products. However, Congress was clear that only the federal government may enforce the FDCA's provisions and FDA's implementing regulations. *See* 21 U.S.C. §337(a) ("all such proceedings for the enforcement, or to restrain violations, of this chapter shall be by and in the name of the United States"); *Buckman Co. v. Plaintiffs' Legal*

*Comm.*, 531 U.S. 341, 352 (2001) (acknowledging only FDA may enforce FDCA).

While doctors are free to prescribe medications for any purpose including off-label uses, FDA has contended that a manufacturer's promotion of an off-label use is a form of misbranding and prohibited by 21 U.S.C. §331(a). *See* 21 C.F.R. 202.1. As a result, when a plaintiff attempts to pursue a purported state-law claim that is premised solely on a pharmaceutical manufacturer's alleged "off-label" promotion of its drug, the claim runs headlong into the prohibition in 21 U.S.C. §337(a). Indeed, courts nationwide have concluded that off-label promotion claims based on allegations like those plaintiffs allege here are preempted. *See, e.g., Markland v. Insys Therapeutics, Inc.*, 270 F. Supp. 3d 1318 (M.D. Fla. 2017) (collecting cases).[12]

Simply stated, because the "existence of [off-label promotion]...is a critical element in [their] case," *Buckman*, 531 U.S. at 353, any off-label promotion claim by plaintiffs claim by plaintiffs is preempted.

## III.  CONCLUSION

For the foregoing reasons, defendants' motion should be granted.

---

[12] *See also Hafer v. Medtronic, Inc.*, 99 F. Supp. 3d 844, 857 (W.D. Tenn. 2015) (claim based solely on off-label promotion preempted); *Brady v. Medtronic, Inc.*, Case No. 13-cv-62199-RNS, 2014 WL 1377830, at *8 (S.D. Fla. Apr. 8, 2014) ("Any negligence claim based on failure to comply with federal law or solely on illegal off-label promotion...is impliedly preempted."); *Blankenship v. Medtronic, Inc.*, 6 F. Supp. 3d 979, 991 (E.D. Mo. 2014) (plaintiff's negligence claim preempted where such claim was based on conduct that would not give rise to recovery under state law in the absence of FDCA regulations); *Houston v. Medtronic, Inc.*, 957 F. Supp. 2d 1166, 1178 (C.D. Cal. 2013) ("any negligence claim based solely on illegal off-label promotion is impliedly preempted"); *Caplinger v. Medtronic, Inc.*, 921 F. Supp. 2d 1206, 1219–20 (W.D. Okla. 2013) ("The conduct plaintiff complains of...is governed by the FDCA. To determine whether said conduct is improper would require reliance on the requirements of the FDCA. Further, even the concept of 'off-label use' is a creature of the FDCA....").

Dated: May 4, 2018

Respectfully Submitted,

/s/ Jeffrey F. Peck
Joseph P. Thomas
Jeffrey F. Peck
K.C. Green
Jeffrey D. Geoppinger
**ULMER & BERNE LLP**
600 Vine Street, Suite 2800
Cincinnati, OH 45202
Phone: (513) 698-5000
Fax: (513) 698-5001
Email: jthomas@ulmer.com
Email: jpeck@ulmer.com
Email: kcgreen@ulmer.com
Email: jgeoppinger@ulmer.com

*Attorneys for Actavis, Inc., Actavis Pharma, Inc., and Actavis Laboratories UT, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on May 4, 2018, the foregoing document was filed via the Court's CM/ECF system, which will automatically serve and send email notification of such filing to all registered attorneys of record.

/s/ Jeffrey F. Peck