## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE: TESTOSTERONE REPLACEMENT THERAPY PRODUCTS LIABILITY LITIGATION | Master Docket No.:  1:14-cv-1748<br><br>Judge:    Hon. Matthew F. Kennelly |
| This document relates to:<br><br>*Brad Martin v. Actavis Inc., et al.*<br>No. 15-cv-4292 | |

### PLAINTIFFS' OPPOSITION TO ACTAVIS DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Ronald Johnson, Jr.
SCHACHTER, HENDY & JOHNSON PSC
909 Wrights Summit Parkway, Suite 210
Ft. Wright, KY 41011
Phone: (859) 578-4444
Fax: (859) 578-4440
Email: rjohnson@pschacter.com

Trent B. Miracle
SIMMONS HANLY CONROY
One Court Street
Alton, IL 62002
Phone: (618) 259-2222
Fax: (618) 259-2252
Email: tmiracle@simmonsfirm.com

Christopher A. Seeger
SEEGER WEISS LLP
77 Water Street
New York, NY 10005
Phone: (212) 584-0700
Fax: (212) 584-0799
Email: cseeger@seegerweiss.com

Plaintiffs' Co-Lead Counsel *on behalf of* Plaintiffs Martin and Brubaker

June 8, 2018

## TABLE OF CONTENTS

Table of Authorities ........................................................................................................ iv

**I. Statement of Facts** ............................................................................................. 1

   A. Actavis Marketed Androderm Off-Label to Treat Fatigue and Low Libido .............. 1

   B. Mr. Martin Was Prescribed Androderm to Treat Fatigue and Low Libido ............... 1

   C. Mr. Martin Suffered a Myocardial Infarction on May 25, 2013 ................................ 2

**II. Law and Argument** ............................................................................................ 3

   A. Androderm Caused Mr. Martin's Myocardial Infarction ........................................... 3

   B. Mr. Martin has Raised Valid Design Defect Claims ................................................. 3

     1. Strict Liability ..................................................................................................... 3

     2. Mr. Martin can Demonstrate Actavis Defendants' Negligence........................... 3

   C. Mr. Martin has Raised a Valid Failure-to-Warn Claim ............................................. 4

     1. Plaintiffs Can Show Actavis Knew or Should Have Known of Androderm's Risks of Major Cardiovascular Events ................................................................ 4

     2. Plaintiffs Can Show Actavis Failed to Warn of Androderm's Cardiovascular Risks ......... 5

     3. Actavis' Dispute with the 2015 FDA Warning Is an Argument for the Jury ...................... 5

   D. Mr. Martin Can Show Actavis' Failure-to-Warn Was the Proximate Cause of His Myocardial Infarction ................................................................................................ 6

     1. Mr. Martin Can Show Dr. Firestone Relied on the Androderm Prescribing Information 6

     2. Mr. Martin Can Also Show That It Was Dr. Firestone's Habit and Practice To Inform His Patients of Risks and Benefits and To Respect His Patients' Wishes ............ 7

     3. Actavis Can Point to No Evidence Indicating it Warned Dr. Firestone .............. 8

     4. Mr. Martin Can Show He Read the Androderm Warnings, He Discussed Them With Dr. Firestone's Nurse, and He Would Not Have Taken Androderm if the Cardiovascular Risks Were Disclosed ............................................................... 10

   E. Mr. Martin's Other Negligence-Based Claims Are Valid ........................................ 10

     1. Failure to Test ................................................................................................... 10

     2. Off-Label Marketing ......................................................................................... 11

   F. Mr. Martin's Remaining Claims Are Also Valid ..................................................... 11

     1. Express Warranty .............................................................................................. 11

     2. Implied Warranty............................................................................................... 12

     3. Negligent Misrepresentation and Fraud............................................................ 12

4. Consumer Protection................................................................................................13

5. Unjust Enrichment.................................................................................................13

G. Mr. Martin's Claims Against Actavis, Inc. Are Valid..................................................13

H. Plaintiff's Request for Punitive Damages are Not Barred ..........................................13

1. The Present Conflict-of-Laws Requires a Choice-of-Law Analysis.....................14

2. The Choice-of-Law Rules of Plaintiff's Home State Must be Applied................15

3. Under Minnesota's Choice-of-Law Rules, Minnesota Law Governs Punitive Damages.16

4. A Genuine Issue of Material Fact as to Whether Plaintiff May Recover Punitive Damages Exists so Defendants' Motion for Summary Judgment Should be Denied............18

5. Even if the Court were to Apply Illinois Choice-of-Law Rules, This Request for Punitive Damages Should Not Be Precluded..............................................................20

**III.    Conclusion** ................................................................................................................**20**

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Bilotta v. Kelley Co.*, 346 N.W.2d 616 (Minn.1984)................................................................ 3, 4, 13

*Bruzer v. Danek Med., Inc.*, No. CIV. 3-95-971/RHKJMM, 1999 WL 613329 (D. Minn. Mar. 8, 1999) ....................................................................................................................................................10

*Caplinger v. Medtronic, Inc.*, 921 F. Supp. 2d 1206 (W.D. Okla. 2013) .......................................12

*Germann v. F.L. Smithe Mach. Co.*, 395 N.W.2d 922 (Minn. 1986) .............................................5

*Holm v. Sponco Mfg., Inc.*, 324 N.W.2d 207 (Minn.1982) ...........................................................4

*Houston v. Medtronic, Inc.* 957 F. Supp. 2d 1166 (C.D. Cal. 2013) .............................................12

*Huggins v. Stryker Corp.*, 932 F. Supp. 2d 972 (D. Minn. 2013)..................................................11

*In re Levaquin Prod. Liab. Litig.*, 700 F.3d 1161 (8th Cir. 2012) ......................................... 4, 6, 9

*J & W Enterprises, Inc. v. Economy Sales, Inc.*, 486 N.W.2d 179 (Minn. Ct. App. 1992)............10

*Johnson v. Zimmer, Inc.*, No. CIV. 02-1328 JTNFLN, 2004 WL 742038 (D. Minn. Mar. 31, 2004) 10, 13

*Kallio v. Ford Motor Co.*, 407 N.W.2d 92 (Minn. 1987)................................................................4

*Kociemba v. G.D. Searle & Co.*, 695 F. Supp. 432 (D. Minn. 1988) .............................................3

*Kruszka v. Novartis Pharm. Corp.*, 19 F. Supp. 3d 875 (D. Minn. 2014), as amended (May 19, 2014) .....4

*Leeb v. Nationwide Credit Corp.*, 806 F.3d 895 (7th Cir. 2015) ...................................................8

*Mulder v. Parke Davis & Co.*, 181 N.W.2d 882 (Minn. 1970) ......................................................6

Restatement Section 402A...............................................................................................................4

*Rosenburg v. Lincoln Am. Life Ins. Co.*, 883 F.2d 1328 (7th Cir. 1989)........................................8

*Westbrock v. Marshalltown Mfg. Co.*, 473 N.W.2d 352 (Minn. Ct. App. 1991)...........................13

*Young v. Pollock Eng'g Grp., Inc.*, 428 F.3d 786 (8th Cir. 2005).................................................4

### <u>Rules</u>

Federal Rule of Civil Procedure 56(a).............................................................................................12

Federal Rule of Civil Procedure 8 ..................................................................................................13

Federal Rule of Evidence 406 ........................................................................................................8

*In re Orthopedic Bone Screw Litig.*, No. CIV. 3-96-1095RHKJMM, 1999 WL 628688 (D. Minn. Mar. 8, 1999) ...............................................................................................................................13

I.   STATEMENT OF FACTS

A.   ACTAVIS MARKETED ANDRODERM OFF-LABEL TO TREAT FATIGUE AND LOW LIBIDO

Androderm was indicated only to treat primary or secondary hypogonadism. Nonetheless, Actavis Defendants engaged in a marketing scheme designed to sell the product for the treatment of fatigue and low libido. This is highlighted not only in the marketing material itself, but in the testimony of Actavis' own director of regulatory affairs, Deepa Desai.

The indication used by Actavis in their marketing materials was insufficient, as it did not include the indications and usage in full. (**Exhibit 1**, Desai Dep. Tr. 99:17-100:8.) (**Exhibit 1**, Desai Dep. Tr. 103:1-104:17.) Specifically, primary and secondary hypogonadism was omitted from the prescribing information. (**Exhibit 1**, Desai Dep. Tr. 107:17-107:23.) Androderm was never approved to treat age-related decline in testosterone levels, (**Exhibit 1**, Desai Dep. Tr. 130:3-131:7.)

After joining the Actavis regulatory team, Ms. Desai had asked her fellow employees a number of times to revise the marketing pieces to include the proper indication, and that request was repeatedly rejected. (**Exhibit 1**, Desai Dep. Tr. 113:10-116:16.) After the final rejection, Ms. Desai was exasperated and wrote: "Okay... sigh. I'll stop asking. Thanks." (*Id.* at 116:21-117:2.)

Actavis Defendants terminated Ms. Desai in April 2015. (**Exhibit 1**, Desai Dep. Tr. 137:24-138:8.) Ms. Desai testified that she was terminated because she would not sign off on marketing pieces that she felt were off-label. (**Exhibit 1**, Desai Dep. Tr. 143:2-143:22.)

B.   MR. MARTIN WAS PRESCRIBED ANDRODERM TO TREAT FATIGUE AND LOW LIBIDO

Plaintiff Brad Martin was 51 years old and, according to his physician, "in generally excellent health" when he was first prescribed Androderm in 2012. (**Exhibit 2**, VA Rec. 00149.) He had been career military, but, after discharge and suffering from chronic fatigue that lingered "for years," Mr. Martin began attempting treatment for his fatigue with Dr. Stephen K. Firestone, his VA physician, and Dr. Firestone's nurse, Amy Hopkins (**Exhibit 3**, Martin Dep. Tr. 135:24-136:8.). After consulting with Nurse Hopkins and reviewing Mr. Martin's medical chart, Dr. Firestone ordered a testosterone

level check and Nurse Hopkins set a follow-up to call Mr. Martin after the lab results were available. (**Exhibit 2**, VA Rec. 00143.)

On October 19, 2012, Nurse Hopkins called Mr. Martin with his testosterone lab results and recorded the following:

> S/O: Veteran reports "I have been doing some research on my own, trying to weigh the benefits versus risk of supplementing testosterone levels. All I really could find is the risk for prostate cancer, really."
>
> Today's lab results reviewed with veteran.
>
> Testosterone 345 10/19/12
>
> Veteran inquires if Dr. Firestone would consider trialing supplementation, even though his result is low end of normal range. Verbalizes understanding of risks.
>
> A: Low, normal testosterone
>
> Plan: Discussed with PCP Firestone. PCP orders: ok to trial low dose testosterone 2mg patch. Recheck level in 1-2 months.
>
> Veteran notified of above, and is agreeable with plan. Will schedule lab only appt in 1-2 months, to recheck testosterone level and effects.

(**Exhibit 2**, VA Rec. 00121-00122.)

Mr. Martin returned the next month, at which time his testosterone level had increased to 565. Mr. Martin reported a significant improvement in his energy level and libido and that he was not experiencing any side effects or concerns. Nurse Hopkins wrote that the Androderm was a "Therapeutic medication regimen, effective r/t [related to] management of testosterone level, libido and fatigue." (**Exhibit 2**, VA Rec. 00121.) She noted she would update Dr. Firestone. (**Exhibit 2**, VA Rec. 00121.)

Mr. Martin used Androderm consistently and as directed by his doctor.

### C. MR. MARTIN SUFFERED A MYOCARDIAL INFARCTION ON MAY 25, 2013

On the morning of May 25, Mr. Martin got up early and was cutting wood when he became extremely fatigued and started experiencing chest pain. (*Id.*) He returned to his cabin, and, after the fatigue and chest pain failed to resolve, he told Mrs. Martin that he needed to go to the hospital and that he may be having a heart attack. (**Exhibit 4**, LuAnn Martin Dep. Tr. 35:15-36:5.)

Doctors in the emergency department at St. Joseph Hospital in Park City, Minnesota ran tests including an EKG and troponin, started Mr. Martin on IV heparin, morphine, and nitroglycerin, and determined he urgently needed a heart catheterization. (**Exhibit 5**, St. Joseph Rec. 00004-00005.) He was taken by helicopter to Essentia Health System in Fargo, North Dakota. (**Exhibit 3**, Martin Dep. Tr. 192:14-193:10.) At Essentia, Mr. Martin was diagnosed with a myocardial infarction and taken immediately into the cath lab for an interventional procedure. (**Exhibit 6**, Essentia 00009-00011.) Two drug-eluting stents were placed. (*Id.*)

Because he was in excellent health, Mr. Martin recovered relatively well from the MI. However, the MI left him with considerably less strength and energy. (**Exhibit 3**, Martin Dep. Tr. 44:5-44:25.)

## II. LAW AND ARGUMENT

### A. ANDRODERM CAUSED MR. MARTIN'S MYOCARDIAL INFARCTION

Actavis Defendants make no assertion that Mr. Martin cannot show causation. Therefore, once the Actavis Defendants' Daubert Motions are denied, Mr. Martin can show Androderm caused his myocardial infarction, and the instant Motion should be denied as to this point.

### B. MR. MARTIN HAS RAISED VALID DESIGN DEFECT CLAIMS

#### 1. STRICT LIABILITY

Actavis Defendants are strictly liability for the harms caused by Androderm, as described in Plaintiffs' Opposition to Actavis Defendants' Preemption Motion.

#### 2. MR. MARTIN CAN DEMONSTRATE ACTAVIS DEFENDANTS' NEGLIGENCE

Minnesota has merged its strict liability and negligence standards. "After *Holm* and *Bilotta*, strict liability and negligence have been, in effect, merged into one negligence-type standard of recovery in design defect cases." *Kociemba v. G.D. Searle & Co.*, 695 F. Supp. 432, 434 (D. Minn. 1988) (*citing Bilotta v. Kelley Co.*, 346 N.W.2d 616 (Minn.1984); *Holm v. Sponco Mfg., Inc.*, 324 N.W.2d 207 (Minn.1982)).

Nevertheless, Minnesota has not done away with strict liability claims. The state has also not adopted Comment (k) to Restatement Section 402A. Instead, Minnesota applies a "reasonable care

balancing test." *Bilotta*, 346 N.W.2d at 621–23. Importantly, Minnesota does not require plaintiff prove a safer alternative design to prevail. "A relevant factor in this balancing test is 'evidence of the existence of a feasible, alternative safer design,' but it is not an element of a design defect case." *Kruszka v. Novartis Pharm. Corp.*, 19 F. Supp. 3d 875, 897 (D. Minn. 2014), as amended (May 19, 2014) (*quoting Kallio v. Ford Motor Co.*, 407 N.W.2d 92, 98 (Minn. 1987)).

Ultimately, "to determine whether there is enough evidence to submit the [design defect] claim to a jury, the court must balance 'the likelihood of harm, and the gravity of harm if it happens, against the burden of the precaution which would be effective to avoid the harm.'" *Young v. Pollock Eng'g Grp., Inc.*, 428 F.3d 786, 789 (8th Cir. 2005) (*quoting Holm*, 324 N.W.2d at 212). Mr. Martin can show Androderm's harm: it causes myocardial infarctions.

### C. MR. MARTIN HAS RAISED A VALID FAILURE-TO-WARN CLAIM

"A plaintiff asserting a negligent failure-to-warn claim under Minnesota law must show: (1) the defendant had reason to know of the dangers of using the product; (2) the warnings fell short of those reasonably required, breaching the duty of care; and (3) the lack of an adequate warning caused the plaintiff's injuries." *In re Levaquin Prod. Liab. Litig.*, 700 F.3d 1161, 1166 (8th Cir. 2012) (internal punctuation marks and citation omitted). Mr. Martin can show all three elements.[1]

#### 1. PLAINTIFFS CAN SHOW ACTAVIS KNEW OR SHOULD HAVE KNOWN OF ANDRODERM'S RISKS OF MAJOR CARDIOVASCULAR EVENTS

Actavis Defendants make no claim challenging Plaintiff'S ability to demonstrate that the company knew or should have known of the cardiovascular risks presented by Androderm, other than to indicate their own disagreement with the conclusion: "Actavis data did not support the conclusion that there was a risk of MACE from Androderm." (Actavis Memo at 9, n.8.).

Even if Actavis will introduce testimony regarding whether they knew or should have known of the risk, Plaintiffs have extensive evidence demonstrating they did. In her report and deposition, regulatory expert Peggy Pence, Ph.D. said that Actavis Defendants had failed to properly warn patients

---

[1] The third element—proximate causation—is addressed in Section II.D, *infra*.

like Mr. Martin of Androderm's propensity to cause cardiac events, like the myocardial infarction Mr. Martin suffered. Actavis Defendants have brought no challenge to Dr. Pence's testimony and have not otherwise raised any argument challenging Plaintiff'S ability to demonstrate Actavis knew or should have known of Androderm's propensity to cause harm.

### 2. PLAINTIFFS CAN SHOW ACTAVIS FAILED TO WARN OF ANDRODERM'S CARDIOVASCULAR RISKS

Actavis Defendants also make no claim challenging Plaintiffs' ability to demonstrate the warning given was inadequate.

In 2015, the FDA compelled Actavis—and other TRT manufacturers—to add an entire subsection to the warnings section of Androderm's Prescribing Information to warn users of Androderm's potential to cause myocardial infarction, stroke, and cardiovascular death.

### 3. ACTAVIS' DISPUTE WITH THE 2015 FDA WARNING IS AN ARGUMENT FOR THE JURY

Rather than challenging Plaintiff'S ability to demonstrate Actavis Defendants knew or should have known of Androderm's cardiovascular risk or that they should have warned of those risks, Actavis Defendants now take issue with the language imposed on them in 2015 by the FDA, claiming that the FDA's language does not actually convey a "warning." The existence of a duty to warn is a legal question for the Court and the adequacy of a warning is a jury question. *Germann v. F.L. Smithe Mach. Co.*, 395 N.W.2d 922, 924 (Minn. 1986); *In re Levaquin Products Liab. Litigation*, 700 F.3d 1161, 1169 (8th Cir. 2012). Actavis attempts to weave an argument between these two pillars, saying it had no duty to warn regarding MACE events because the FDA's later-imposed warning is something less than a true warning.

Actavis' position is an extraordinary leap and does not entitle them to judgment. The text is within the Prescribing Information's "WARNINGS AND PRECAUTIONS" section and carries the bolded title "Cardiovascular Risk." This alone conveys that the later-added text is, in fact, a warning. Moreover, the sufficiency of a warning is a jury question, meaning Actavis' claim that the 2015 warning is not a true warning must be decided by a jury.

5

#### D. **M**R. **M**ARTIN **C**AN **S**HOW **A**CTAVIS' **F**AILURE-TO-**W**ARN **W**AS THE **P**ROXIMATE **C**AUSE OF **H**IS **M**YOCARDIAL **I**NFARCTION

Minnesota has adopted the learned intermediary doctrine, finding that a manufacturer may discharge its duty to provide an adequate warning by providing that warning to prescribing physicians. *Mulder v. Parke Davis & Co.*, 181 N.W.2d 882, 885 (Minn. 1970) ("We agree that where the only issue is failure to communicate a warning, the manufacturer is not liable if the doctor was fully aware of the facts which were the subject of the warning."). "Under the learned intermediary doctrine, as adopted in Minnesota, prescription drug manufacturers can satisfy their duty to warn by warning prescribing physicians of the risks associated with a drug, rather than warning patients directly. *In re Levaquin*, 700 F.3d at 1166.

Actavis hinges its Motion on one fact: Mr. Martin's prescriber, Stephen K. Firestone, M.D., passed away before this litigation began. Actavis asks that the learned intermediary doctrine, combined with Dr. Firestone's death, absolve it from liability. This is unsupported by the law.

#### 1. **M**R. **M**ARTIN **C**AN **S**HOW **D**R. **F**IRESTONE **R**ELIED ON THE **A**NDRODERM **P**RESCRIBING **I**NFORMATION

Mr. Martin can show that Dr. Firestone was familiar with and relied on information about Androderm's risks and benefits when making the prescribing decision. When Nurse Hopkins called Mr. Martin to report the results of his testosterone level test, she recorded the following exchange in his medical records:

> S/O: Veteran reports "I have been doing some research on my own, trying to weigh the benefits versus risk of supplementing testosterone levels. All I really could find is the risk for prostate cancer, really."
>
> Today's lab results reviewed with veteran.
>
> Testosterone 345 10/19/12
>
> Veteran inquires if Dr. Firestone would consider trialing supplementation, even though his result is low end of normal range. Verbalizes understanding of risks.
>
> A: Low, normal testosterone
>
> Plan: Discussed with PCP Firestone. PCP orders: ok to trial low dose testosterone 2mg patch. Recheck level in 1-2 months.

6

> Veteran notified of above, and is agreeable with plan. Will schedule lab only appt in 1-
> 2 months, to recheck testosterone level and effects.

(**Exhibit 2**, VA Rec. 00122.)

Nurse Hopkins *twice* noted Mr. Martin's acknowledgement of the risks and benefits, first by directly quoting his recitation of the benefits and risks, then by noting: "Verbalizes understanding of risks." Then, Nurse Hopkins discussed the matter with Dr. Firestone. Finally, after noting she called Mr. Martin back to relay that Dr. Firestone approved the prescription, she noted the doctor would like a follow-up to check both whether Androderm had increased Mr. Martin's testosterone level and whether he had any other effects. A month later, at the follow-up, Nurse Hopkins noted that Mr. Martin was doing well on Androderm and that he was not experiencing any side effects or concerns. She then updated Dr. Firestone.

These multiple back-and-forth interactions about efficacy and side effects indicate Dr. Firestone was aware of and was actively considering Androderm's risks and benefits (as they were portrayed at that time). This is evidence that Dr. Firestone was reading and relying on the warning, and it entirely defeats Actavis' theory that because Dr. Firestone has since passed away, Mr. Martin cannot show he relied on Androderm's prescribing information when making this prescribing decision. Of course, in viewing these exchanges, Mr. Martin is entitled to a favorable view of the facts and the reasonable inferences that can be drawn from them. *Leeb v. Nationwide Credit Corp.*, 806 F.3d 895, 897 (7th Cir. 2015).

2. **MR. MARTIN CAN ALSO SHOW THAT IT WAS DR. FIRESTONE'S HABIT AND PRACTICE TO INFORM HIS PATIENTS OF RISKS AND BENEFITS AND TO RESPECT HIS PATIENTS' WISHES**

In addition to directly proving Dr. Firestone relied on the risk and benefit information provided by Actavis, Mr. Martin can also demonstrate that it was Dr. Firestone's habit to inform his patients of the risks and benefits and respect their decisions in the prescribing process.

Mr. Martin saw Dr. Firestone for a number of years and, during that time, Dr. Firestone wrote, renewed, and monitored a number of different prescriptions for him. (*See generally* **Exhibit 2**, VA Rec.) Mr. Martin can show that Dr. Firestone discussed medication risks and the expected benefits with him

in the prescribing process: "When I would see Dr. Firestone, he discussed with me every diagnosis he made, various treatment options for any diagnosis, the potential risks and benefits of not treating, and the potential risks and benefits presented by any treatment, including treatment with a prescription medication." (**Exhibit 7**, Martin Aff. ¶ 4.)[2] Mr. Martin went on to say that Dr. Firestone respected his decision to not take a medication. (*Id.* at ¶ 5) and that if he had known of the cardiovascular risks, he would not have taken Androderm (*id.* at ¶¶ 13, 14).

Evidence of Dr. Firestone's habit or practice in treating Mr. Martin is admissible to show that Dr. Firestone would have acted in accordance with that habit or practice. Fed. R. Evid. 406; *Rosenburg v. Lincoln Am. Life Ins. Co.*, 883 F.2d 1328, 1336 (7th Cir. 1989).

The fact that Dr. Firestone discussed the diagnosis, the risks, and the benefits of every prescribing decision with Mr. Martin is evidence that he would have acted in accordance with this practice and would have shared the cardiovascular risk with Mr. Martin if Actavis had disclosed it to him. Likewise, the fact that Dr. Firestone made the prescribing process a collaborative one and respected Mr. Martin's decision on whether to take a medication demonstrates he would have acted in accordance with this practice regarding Androderm, and, if after hearing of the risks, Mr. Martin said he did not want to take the medication, this is evidence Dr. Firestone would have respected that decision.

Thus, this is additional evidence showing a proper cardiovascular warning would have led to Mr. Martin not taking Androderm and not have a myocardial infarction.

### 3. ACTAVIS CAN POINT TO NO EVIDENCE INDICATING IT WARNED DR. FIRESTONE

While the learned intermediary doctrine allows a manufacturer to fulfill its duty by warning the prescriber, *In re Levaquin*, 700 F.3d at 1166, Actavis can point to no evidence that it warned Dr. Firestone—or anyone in the medical community—of Androderm's cardiovascular-related risks. Actavis' request that it be granted summary judgment because Dr. Firestone passed away and is unable

---

[2] Mr. Martin supplemented his deposition testimony with an affidavit entered shortly after the deposition on topics not raised during the deposition.

to testify that Actavis did not warn him should not be grounds for allowing the company to invoke the learned intermediary doctrine to its benefit.

From the time Dr. Firestone prescribed Androderm (October 2012) through the time Mr. Martin had a myocardial infarction (July 2013), Androderm's label included no such warning. In fact, two more years would pass before the FDA would impose upon Actavis the now-current cardiovascular risk language. Moreover, to this day, Actavis Defendants claim that the warning is not necessary (which makes it even more extraordinary that the company would have contacted Dr. Firestone in St. Cloud, Minnesota in 2012 to tell him of a risk they still claim does not exist).

Additionally, Actavis admits it had no contact with Dr. Firestone ever—whether in that period or before or after, and whether by sending a "dear health care provider" letter, by responding to a medical inquiry, by communicating through a detailer, or by retaining Dr. Firestone as a consultant. (**Exhibit 8**, Martin DFS at 3-4.) Thus, while the learned intermediary doctrine says that Actavis *could* have discharged its duty to warn by telling Dr. Firestone of Androderm's risks, *it did not*.

Actavis relies on three cases in which the warnings were provided but either were not read at all or were disregarded. In *Johnson v. Zimmer, Inc.*, "Dr. Knudsen also testified that he had never, in any context, seen the warnings provided with the Centralign product." No. CIV. 02-1328 JTNFLN, 2004 WL 742038, at *10 (D. Minn. Mar. 31, 2004). Likewise, in *J & W Enterprises, Inc. v. Economy Sales, Inc.*, an employee testified he did not remember reading the allegedly faulty warning on a fire extinguisher, and the Court found the case could not proceed on a failure-to-warn claim where the user denied reading the would-be inadequate warning. 486 N.W.2d 179, 181 (Minn. Ct. App. 1992). Similarly, *Bruzer v. Danek Med., Inc.*, does not help Actavis' position either. No. CIV. 3-95-971/RHKJMM, 1999 WL 613329, at *6 (D. Minn. Mar. 8, 1999). In *Bruzer*, the surgeon testified "he would have recommended pedicle screw fixation regardless of the existence or content of any warnings provided by the Defendants." *Id*.

Actavis argues that *Bruzer* requires Mr. Martin prove Dr. Firestone would not have prescribed Androderm if the warnings were proper. But, in fact, *Bruzer* only addresses an instance where a physician affirmatively declared he would not have changed how he performed a surgery—and what

screws he used during that surgery—even if the maker of those screws had given a different warning. Thus, *Bruzer* is highly distinguishable from this case where Mr. Martin can demonstrate that his prescriber was informed of the risks and benefits of the medication, where he can demonstrate that he would have respected his patient's decision to not take a medication, and where he can demonstrate that he, himself would not have taken the drug if the warnings were proper.

None of these cases provides Actavis any help because Actavis provided no proper warning, and there is no evidence that either Dr. Firestone or Mr. Martin would have—or did—ignore provided warnings. (In fact, the evidence shows quite the opposite.)

### 4. MR. MARTIN CAN SHOW HE READ THE ANDRODERM WARNINGS, HE DISCUSSED THEM WITH DR. FIRESTONE'S NURSE, AND HE WOULD NOT HAVE TAKEN ANDRODERM IF THE CARDIOVASCULAR RISKS WERE DISCLOSED

Mr. Martin researches his medication diligently and extensively. (**Exhibit 3**, Martin Dep. Tr. 130:23-132:25.) And, he researched this particular medication, specifically to educate himself on its risks and benefits. (**Exhibit 3**, Martin Dep. Tr. 141:23-143:5.) In fact, even Mr. Martin's medical records reflect this: "Veteran reports 'I have been doing some research on my own, trying to weigh the benefits versus risk of supplementing testosterone levels. All I really could find is the risk for prostate cancer, really.'" (**Exhibit 2**, VA Rec. 00122.)

Mr. Martin has said that he would not have taken Androderm if the cardiovascular risks that were added in 2015 were disclosed to him in 2012. (**Exhibit 7**, Martin Decl. ¶¶ 13, 14.) Thus, Mr. Martin can show in this additional way that the lack of a proper warning was the proximate cause of his using Androderm and suffering a myocardial infarction.

### E. MR. MARTIN'S OTHER NEGLIGENCE-BASED CLAIMS ARE VALID

#### 1. FAILURE TO TEST

Actavis says "Plaintiff appears to assert a negligent failure-to-test claim" and asks the Court to dismiss it. (Actavis MSJ Memo at 11.) This request is without merit.

The Master Complaint contains no specific "failure to test" claim, but the concept is addressed within the Negligence claim. The case Actavis cited in its Brief perfectly supports this: "Failure to test is not an independent cause of action under Minnesota law, but manufacturers' duty to test their products to discover defects or dangers associated with use of the products is a subpart of duties to design a product non-negligently, manufacture a product non-negligently, and provide adequate warnings of dangers associated with its use." *Huggins v. Stryker Corp.*, 932 F. Supp. 2d 972, 987 (D. Minn. 2013) (internal punctuation marks and citation omitted).

As to it "failure to test" argument, Actavis has not identified a claim or a part of a claim on which judgment is sought. Fed. R. Civ. P. 56(a).

### 2. OFF-LABEL MARKETING

Actavis asks the Court to grant summary judgment related to Plaintiffs' claims of off-label marketing. As an initial matter, the company seems to indicate that Plaintiffs can show extensive evidence of off-label conduct, as is detailed, for instance, in Dr. Peggy Pence's report. (Actavis MSJ Memo at 11.) Moreover, Plaintiffs can point to the testimony of whistleblower Deepa Desai, once an Actavis regulatory employee who testified that much of the Androderm marketing was off-label. (*See* Section I.A, *supra*.)

Actavis asks for judgment, however, on what appears to be federal preemption grounds, but the two cases it cites provide no support. Both *Houston v. Medtronic, Inc.* and *Caplinger v. Medtronic, Inc.*, involve the same medical device (not pharmaceutical) and that device had received premarket approval, which invokes a specialized preemption analysis unrelated to this type of drug. 957 F. Supp. 2d 1166 (C.D. Cal. 2013); 921 F. Supp. 2d 1206 (W.D. Okla. 2013).

### F. MR. MARTIN'S REMAINING CLAIMS ARE ALSO VALID

#### 1. EXPRESS WARRANTY

Actavis made statements about Androderm's safety and effectiveness in its prescribing information and marketing. As discussed previously, Mr. Martin can show he researched Androderm's risks and benefits and that he decided to use the medication based on what he learned in that process.

Actavis Defendants ask for judgment on the premise that Dr. Firestone did not receive the same information. This should be denied for two reasons: First, Dr. Firestone did see and rely on information about Androderm, as described throughout. Second, breach of warranty claims are analyzed outside the learned intermediary doctrine, meaning Dr. Firestone's direct reliance on them is immaterial. *E.g.*, *Johnson v. Zimmer, Inc.*, No. CIV. 02-1328 JTNFLN, 2004 WL 742038, at *11 (D. Minn. Mar. 31, 2004) (granting judgment on learned intermediary doctrine as to strict liability and negligence claims, but analyzing warranty claims outside that lens).

### 2. IMPLIED WARRANTY

Actavis claims Minnesota has merged its breach-of-implied-warranty claim into a single products liability theory. *Westbrock v. Marshalltown Mfg. Co.*, 473 N.W.2d 352, 356 (Minn. Ct. App. 1991) (*citing Bilotta v. Kelley Co., Inc.*, 346 N.W.2d 616, 624 (Minn.1984)). Even if this is true, it does not entitle Actavis to judgment because a party can plead claims in the alternative, including in cases where the alternatives eventually merge or cannot both be granted. Fed. R. Civ. P. 8(d).

As is discussed throughout, Mr. Martin can show that Androderm was not fit for its ordinary purpose in that it was not safe or effective in treating fatigue, low energy, and low libido, in spite of Actavis' marketing the product for those purposes.

### 3. NEGLIGENT MISREPRESENTATION AND FRAUD

Mr. Martin will not purse his negligent misrepresentation claim.

On the other hand, Mr. Martin's fraudulent misrepresentation claim is entirely valid. Mr. Martin can show Actavis Defendants misrepresented that Androderm was safe and effective for treating the symptoms of aging, including his fatigue, his low energy, and his low libido. He can show he relied on those representations in deciding to use Androderm, and he can show that directly led to his myocardial infarction.

Actavis claims the learned intermediary doctrine applies to this claim, but it cites no case law supporting that. Only three Minnesota decisions—all in member cases related to the same bone screw litigation—support this position. *E.g.*, *In re Orthopedic Bone Screw Litig.*, No. CIV. 3-96-1095RHKJMM,

1999 WL 628688, at *14 (D. Minn. Mar. 8, 1999), aff'd, 221 F.3d 1343 (8th Cir. 2000). This case is highly distinguishable from the bone screw litigation, however, because Actavis marketed directly to consumers, the false and misleading statements were communicated directly from Actavis to Mr. Martin, and Mr. Martin directly relied on those statements.

Moreover, even if it were true that the learned intermediary doctrine applies to all fraudulent misrepresentation claims, Mr. Martin can show that Actavis Defendants marketed Androderm off-label to treat the symptoms of aging, that Dr. Firestone was aware of Androderm's purported benefits in treating fatigue and low libido, and that he relied on this information in making the prescribing decision. Therefore, Actavis is not entitled to judgment as to this point.

### 4. CONSUMER PROTECTION

Actavis points out that Minnesota's consumer protection statute provides the sole remedy of injunctive relief, but it incorrectly claims Mr. Martin did not request injunctive relief. In fact, he did. *See* Master Complaint, Prayer for Relief, ¶ I.

### 5. UNJUST ENRICHMENT

Mr. Martin will not pursue his unjust enrichment claim.

### G. MR. MARTIN'S CLAIMS AGAINST ACTAVIS, INC. ARE VALID

Mr. Martin has claims against three Actavis entities: the manufacturer, the NDA holder, and the parent company. Now, Actavis ask the Court to dismiss the parent company (Actavis Inc.), but it cites no law or reason supporting its request. Moreover, Plaintiffs have simultaneously filed a Motion for Sanctions requesting the Court deny judgment as to this point as a sanction for refusing to produce a witness or documents responsive to valid discovery requests.

### H. PLAINTIFF'S REQUEST FOR PUNITIVE DAMAGES ARE NOT BARRED

Consistent with this Court's prior orders, and considering the true conflict-of-laws as to punitive damages in the instant case, the choice-of-law rules of Plaintiff's home state, Minnesota, must be applied to determine which laws govern Plaintiff's request for punitive damages. Under

Minnesota's analysis, it's interest in protecting its residents from wrongdoing dictates the application of Minnesota's punitive damages law.

     **1.   THE PRESENT CONFLICT-OF-LAWS REQUIRES A CHOICE-OF-LAW ANALYSIS**

The Parties in the instant case are domiciled, do business in, or otherwise engage in significant conduct relevant to the claims in this case in multiple states. Potentially applicable states include: Minnesota as the Plaintiff's home state and the place of injury; and Utah, New Jersey or Illinois as centers of decision-making as to Androderm.  A choice-of-law analysis must be performed here because a true conflict exists regarding the availability of punitive damages under the respective state laws. *Healey v. I-Flow, LLC*, 853 F. Supp. 2d 868, 871 (D. Minn. 2012).

Punitive damages are available in Minnesota pursuant to Minnesota Statue §549.20 and, contrary to Actavis' assertions, Plaintiff is not procedurally barred from recovering punitive damages under Minnesota law.  It is true that plaintiffs must plead punitive damages through a motion to amend to allow punitive damages. Minn. Stat. § 549.191. Statute §549.191 requires prima facie evidence of entitlement to punitive damages.  In the instant case, multiple depositions of Actavis' former employees have yet to be completed. Plaintiff will complete the necessary steps  for punitive damages upon the completion of discovery.

Like Minnesota, Illinois allows punitive damages, so long as the tort "is committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard for the rights of others." *Parker v. Four Seasons Hotel, Ltd.,* 845 F. 3d 807, 812 (2017). In contrast, New Jersey's punitive damages statute precludes punitive damages except "where the product manufacturer knowingly withheld or misrepresented information required to be submitted under the agency's regulations, which information was material and relevant to the harm in question." N.J. Stat. § 2A:58C-5.  Utah Code Ann. § 78B-8-201 similarly bases the recovery of punitive damages upon a showing of willful and malicious or intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference towards, and a disregard of, the rights of others. Despite negative precedent, the state of the law has sufficiently evolved to warrant

re-examination of that preemption. Because the availability of punitive damages and the applicable evidentiary standards vary among these states, a true conflict-of-law exists and an adequate choice-of-law analysis is required.

### 2. THE CHOICE-OF-LAW RULES OF PLAINTIFF'S HOME STATE MUST BE APPLIED

Consistent with Seventh Circuit Precedent and this Court's Case Management Order 12 and Case Management Order 47, the choice-of-law rules of Plaintiff's home state, Minnesota, are the applicable rules for the analysis required here. In CMO No. 74 (Ruling on Abbvie's motion for summary judgment on failure-to warn claims), this Court stated that "[t]he Seventh Circuit has indicated that in 'foreign cases filed directly in a district court as part of ongoing multidistrict litigation,' courts generally should treat the cases, for the purposes of applicable choice of law rules, as originating outside the district and thus should apply the choice of law rules of the originating states." Case Mgmt. Order No. 47 at 50 (citing *Dobbs v. DePuy Orthopedics, Inc.*, 842 F.3d 1045, 1049 (7ᵗʰ Cir. 2016). This Court clarified that "this rule applies only to foreign cases that were directly filed in the district overseeing the MDL" and that "[a]s established by the Court in Case Management Order No. 12, any actions filed in this MDL proceeding after October 24, 2014 solely against Abbvie are treated as originally filed in this district." *Id.*

In CMO No. 12, this Court defined which cases in this MDL will be treated as a "foreign case," that is, treated as originating in the Plaintiff's home state. It provides that any cases directly filed after the entry of CMO No. 12 "other than certain cases involving Abbvie/Abbott only…*shall be treated as if originally filed in the federal district where the Plaintiff was a citizen at the time of the filing of his or her first complaint*." Dkt. No. 440 Case Mgmt. Order No. 12 at B(ii) (emphasis added). Accordingly, Plaintiff's case is a "foreign case" originating in Minnesota, as it was directly filed after October 24, 2014 while Plaintiff was a citizen of Minnesota.

Case: 1:15-cv-04292 Document #: 68 Filed: 06/08/18 Page 20 of 26 PageID #:7096

**3.** <span style="font-variant: small-caps">Under Minnesota's Choice-of-Law Rules, Minnesota Law Governs Punitive Damages</span>

Minnesota employs the choice-influencing consideration analysis in determining which state's laws apply to a given issue. *Danielson v. Nat'l Supply Co.*, 670 N.W.2d 1, 7 (Minn. Ct. App. 2003). After establishing a true conflict of laws and that more than one state's law may be constitutionally applied, Minnesota looks to five choice-influencing considerations: (1) predictability of result; (2) maintenance of interstate order; (3) simplification of judicial task (4) advancement of the forum's governmental interests; and (5) application of the better rule of law. *Id.* at 6 (citing *Jepson v. Gen. Cas. Co. of Wisconsin*, 513 N.W.2d 467, 470 (Minn. 1994)). As demonstrated above, a true conflict exists and the analysis must proceed to the next step.

A decision in the *In re: Levaquin Products Liability Litigation*, MDL No. 08-1943 (JRT), 2010 WL 7852346 (D. Minn. Nov. 9, 2010). in Minnesota district court, is directly on-point, as it conducted a nearly identical analysis to the one required here: comparing plaintiff's home state versus defendants' home state. Although the court found that Minnesota law applied on a different basis[3], it nevertheless analyzed Minnesota and New Jersey's punitive damages laws to find that , under Minnesota's five factor test, the Minnesota law applied. *In re: Levaquin Prods. Liab. Litig.*, MDL No. 08-1943 (JRT), 2010 WL 7852346 at *2 (D. Minn. Nov. 9, 2010).

The *Levaquin* Court focused on the fourth factor, the advancement of the forum's governmental interest, after acknowledging the relative insignificance of factors one, three, and five. *Id.* (citing *Burks v. Abbott Labs.*, 639 F.Supp.2d 1006, 1013 (D. Minn. 2009); *U.S. Fire Ins. Co. v. Goodyear Tire & Rubber Co.*, 920 F.2d 487, 491 (8th Cir. 1990); and *Nodak Mut. Ins. Co. v. Am. Family Mut. Ins. Co.*, 604 N.W.2d 91, 96 (Minn. 2000)). In evaluating the fourth factor, the advancement of the forum's governmental interest, the *Levaquin* court specifically rejected the characterization of this factor as an evaluation of the advancement of the varying governmental interest of two states with conflicting

---

[3] The court discussed whether the Minnesota punitive damages laws were substantive or remedial but made clear that "[t]he substantive/remedial determination for a conflict of law analysis under Minnesota law is a different inquiry than that posed to courts determining whether to apply a federal or state law under the *Erie* doctrine." *Levaquin*, 2010 WL 7852346 at *2, n.5

laws, such as the evaluation described in the Second Restatement of Conflict of Laws. The court clarified that, "**under Minnesota law the Court evaluates only the advancement of the forum's governmental interest**" and that, "[u]nlike the analyses adopted by other states, Minnesota choice of law analysis does not require a comparison between Minnesota's interest with the governmental interest of the other state." *Id.*,(emphasis in the original).

The court found that Minnesota "has a strong interest in preventing injury to its citizens, and thus allows punitive damages as punishment to wrongdoers and that **the state's interest in protecting its citizens and punishing wrongdoers could be furthered only if the responsible parties felt the effects of punitive damages awards."** citing *In re: Levaquin* at 10 (citing *U.S. Fire Ins. Co.*, 920 F.2d at 491 (emphasis in the original)). In a prior case, the Minnesota district court "explicitly rejected the arguments . . . that Minnesota's only governmental interest in punitive damages was the 'compensation of Minnesota residents who are victims of torts.'" *In re: Levaquin* at 10 (quoting *U.S. Fire Ins. Co.*, 920 F.2d at 745). The court also stated that when a defendant "does business in Minnesota, it must expect the same treatment as would be given a Minnesota corporation," even if it may have different expectations as to doing business in other states. *Id.,* (citing *U.S. Fire Ins. Co.*, 920 F.2d at 743).

The Minnesota District Court similarly found in another MDL that, under the Minnesota choice-of-law rules, the laws of each plaintiff's home state applied as to punitive damages. In *In re: Mirapex Products Liability Litigation*, after noting that "the first and third factors . . . have generally not been applied in tort cases" and that "Minnesota courts have not placed any emphasis on the fifth factor in twenty years," the Minnesota district court did look to the second factor in analysis. *In re: Mirapex Prod. Liab. Litig. Related Cases*, No. CV 06-1206 JMR/FLN, 2007 WL 9636345, at *4 (D. Minn. Nov. 27, 2007). In that MDL, the court stated that "applying the punitive damages law of one state to plaintiffs from multiple states where individual state laws differ so significantly would not promote the maintenance of intestate order or a coherent legal system" *Id.* at 4. It stated that "the maintenance of interstate order factor favors applying the substantive punitive damages law . . . of the plaintiff's residence because the alleged injuries occurred in the Plaintiffs' home states". *Id.* The Minnesota

17

district court also found that the fourth factor, the advancement of the forums' governmental interest, "generally weighs in favor of the application of the state law in which the plaintiff lives and in which the injury occurred" and held that "for each plaintiff, [the court] will apply the punitive damages law of the state in which that plaintiff resides." *Id.*

Accordingly, under Minnesota's choice-of-law rules, the laws of the plaintiff's residence, and not the law of Defendant's home state applies to punitive damages. Therefore, Minnesota law governs punitive damages in the instant case.

4. A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER PLAINTIFF MAY RECOVER PUNITIVE DAMAGES EXISTS SO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED.

Minnesota Statute §549.20 allows punitive damages upon clear and convincing evidence that the acts of the defendant show deliberate disregard for the rights or safety of others. The record facts here, taken in the light most favorable to Plaintiffs, show an extended pattern of conduct by Actavis that put men at risk for the injuries at issue in this litigation that warrants punitive damages.

Actavis knew Androderm had not been proven adequately safe and effective to treat age-related hypogonadism, or to relieve symptoms such as erectile dysfunction, fatigue, or depression and was not indicated for those uses. *See, e.g.,* Androderm FAQs, WLI-MDL2545-00199180; 08/11/2005 FDA Memorandum of Meeting Minutes, WLI-MDL2545-00118388; and Desai Dep. Tr. 86:17-87:18; 107:17-23 and 169:2-17 (**Exhibit 9-12**, respectively) . The FDA even explicitly told Actavis, in-person, that use of testosterone replacement for aging men with "andropause" was off-label. (**Exhibit 13,** WLI-MDL2545-00118388 at 8395).

Despite this knowledge, Actavis marketed to those conditions and sought to increase physician awareness of those symptoms to grow the TRT market of and drive prescriptions. *See, e.g.,* Armstrong Dep. Ex. 9; Armstrong Dep. Ex. 8, POA 2; Knowles Dep. Ex. 6, New Hire Presentation; and Knowles Dep. Ex. 27, Low Libido (**Exhibits 14through 17**, respectively).

Even when Actavis' own Director of Regulatory Affairs, Deepa Desai reported her concerns regarding the misbranding of Androderm to her superiors, and subsequently filed suit against the

18

company alleging she was terminated for, among other things, opposing the misbranding of Androderm, Actavis did not change their strategy. *See* **Exhibit 18** Desai Dep. Tr. 109:9-120:24; Desai Dep Ex. 12 (**Exhibit 19**); and Desai Dep. Ex. 2 (**Exhibit 20**). As explained at length above, at all times relevant to the each of the Plaintiff's claims, Androderm failed to adequately warn the medical community about the risks in question with deliberate disregard for the safety of the men to whom it was extensively marketing its product.

Furthermore, Actavis was in a unique position by virtue of its agreement with the makers of Androgel, under which Actavis and its predecessor entities promoted Androgel to urologists. Amato Dep. Ex.5 (**Ex. 21**). Through this arrangement, Actavis was not only privy to Abbvie's marketing strategies, materials and other Androgel information, but Abbvie was contractually obligated to provide it. In effect from 2007 to approximately 2015, this agreement also required Abbvie to train Actavis employees on all facets of Androgel, including unbranded content and disease-state awareness initiatives. Sanford Rough Dep. Tr. 231:20-234:23 (**Ex. 22**). Here, the claims brought against Actavis clearly allow for recovery of punitive damages under Minnesota law.

As the FDA has made clear, "the benefits and safety of [using testosterone products to treat symptoms in men who have low testosterone for no apparent reason other than aging] have not been established." FDA Drug Safety Communication, March 3, 2015. Not only did the vast majority of men treated with TRT not *need* it, there was no evidence it would help them at all. Against that backdrop, Androderm's understatement of risks and over-promotion of benefits takes on a particularly insidious nature. *See Proctor*, 683 N.E.2d at 1214-15 (finding drug company's violation of duty to warn even more "egregious" and "insidious" where it encouraged and participated in disseminating misleading information to learned intermediaries). Based on the foregoing record facts, whether Androderm's conduct was so grossly negligent as to amount to a deliberate disregard for the rights of others is now for the jury to decide.

**5. EVEN IF THE COURT WERE TO APPLY ILLINOIS CHOICE-OF-LAW RULES, THIS REQUEST FOR PUNITIVE DAMAGES SHOULD NOT BE PRECLUDED.**

Even if the Court were to find that New Jersey law governs Plaintiff's request for punitive damages, punitive damages would not be precluded in the instant case. Although a New Jersey Appellate Division case found that the exception to the New Jersey Product Liability Act (NJPLA) punitive damage provision was preempted, that decision has been called into doubt in multiple cases. In one such case, a district court conducting a choice-of-law analysis between California and New Jersey in pharmaceutical products liability case stated that:

> In *McDarby v. Merck & Co., Inc.,* 401 N.J.Super. 10, 949 A.2d 223 (2008), the appellate Division of the New Jersey Superior Court, relying principally on *Buckman Co. v. Plaintiffs' Legal Committee,* 531 U.S. 341, 348, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001), which held that "state-law fraud-on-the-FDA claims conflict with, and are therefore impliedly pre-empted by, federal law," found the exception to be preempted by FDA regulations. *Id.* at 94. The holding of *McDarby,* however, has been called into doubt by *Wyeth v. Levine,* 555 U.S. 555, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009) and *Forman v. Novartis Pharmaceuticals Corp.,* 793 F.Supp.2d 598 (E.D.N.Y.2011).

*Hill v. Novartis Pharm. Corp.,* No. 1:06-CV-00939-AWI, 2012 WL 967577, at *2, n.2 (E.D. Cal. Mar. 21, 2012). Other cases giving a restrictive reading to *Buckman* after *Wyeth* include *Sullivan v. Novartis pharm. Corp.,* 602F. Supp. 2d 521 (D.N.J. 2009); Bausch v. Stryker Corp., 630 F.3d 546, 558 (7th Cir. 2010); Stengel v. Medtronic, Inc., 704 F.3d 1224, 1232-33 (9th Cir. 2013); and Arters v. Sandoz Inc., 921 F. Supp. 2d 813, 819-820 (S.D. Ohio 2013).

Furthermore, in *Sullivan,* Plaintiff would be presenting evidence of withheld or misrepresented information to meet the threshold for punitive damages, not in pursuit of a claim that Actavis committed fraud-on-the-FDA. As a result, Plaintiff would not be pursuing a preempted claim and his request for punitive damages should not be precluded.

## III. CONCLUSION

For the reasons described herein, Actavis Defendants' Summary Judgment Motion should be denied in its entirety, except as to Mr. Martin's negligent misrepresentation and unjust enrichment claims.

June 8, 2018.                              Respectfully Submitted,

                                           */s/ Trent B. Miracle*
                                           Trent B. Miracle
                                           **SIMMONS HANLY CONROY**
                                           One Court Street
                                           Alton, IL 62002
                                           Telephone: (618) 259 -2222
                                           Facsimile: (618) 259 -2251
                                           tmiracle@simmonsfirm.com

                                           Ronald Johnson, Jr.
                                           **SCHACHTER, HENDY & JOHNSON PSC**
                                           909 Wrights Summit Parkway, Suite 210
                                           Ft. Wright, KY 41011
                                           Phone: (859) 578 -4444
                                           Fax: (859) 578 -4440
                                           rjohnson@pschachter.com

                                           Christopher A. Seeger
                                           **SEEGER WEISS LLP**
                                           77 Water Street
                                           New York, NY 10005
                                           Phone: (212) 584 -0700
                                           Fax: (212) 584 -0799
                                           cseeger@seegerweiss.com

                                           *Plaintiffs' Co-Lead Counsel*

## CERTIFICATE OF SERVICE

I transmitted a true and accurate copy of the foregoing **Plaintiffs' Opposition to Actavis Defendants' Motion for Summary Judgment** by filing a copy on the Court's electronic filing system on this date.

  June 8, 2018.                      */s/ James G. O'Brien*
                                          James G. O'Brien (Ohio 0088460, Cal. 308239)