**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **In re Testosterone Replacement Therapy** | ) | |
| **Products Liability Litigation Coordinated** | ) | **Case No. 14 C 1748** |
| **Pretrial Proceedings** | ) | **MDL No. 2545** |
| | ) | |
| **(This document applies to all cases and to** | ) | |
| ***Martin v. Actavis, Inc.*, Case No. 15 C 4292)** | ) | |

**CASE MANAGEMENT ORDER NO. 185**
**(Rulings on plaintiff's motion to amend a prior ruling,**
**plaintiff's motion for sanctions, and certain motions *in limine* in**
***Martin v. Actavis, Inc.*, Case No. 15 C 4292)**

MATTHEW F. KENNELLY, District Judge:

Plaintiff Brad Martin's primary care physician, Dr. Stephen Firestone, prescribed

him Androderm—a testosterone replacement therapy (TRT) drug—in October 2012.

Martin suffered a heart attack in May 2013, when he was 52 years old.  Martin alleges

that his use of Androderm caused the heart attack.  He sues Actavis, Inc., Actavis

Pharma, Inc., and Actavis Laboratories UT, Inc. (collectively, Actavis), which

manufacture or sell the drug.[1]

Martin's case is part of a multidistrict litigation (MDL) proceeding brought against

several manufacturers and sellers of TRT drugs.  The plaintiffs in the MDL proceeding

allege that they suffered serious cardiovascular injuries or injuries related to blood clots

in the veins (venous thromboembolisms) as a result of taking the defendants' TRT

drugs.  In July 2018, the parties executed a Master Settlement Agreement covering

cases involving Actavis.  In August 2019, Martin informed the Court that he elected not

---

[1] Actavis maintains that Actavis, Inc. is a holding company that does not manufacture or
sell the drug.

to settle his claims.  The following claims survived Actavis's motion for summary

judgment:  failure to warn, design defect, negligence, breach of express warranty,

fraudulent misrepresentation, violation of the Minnesota Deceptive Trade Practices Act

(MDPTA), Minn. Stat. § 325D.44(13), and punitive damages.  *See In re Testosterone*

*Replacement Therapy Prods. Liab. Litig. Coordinated Pretrial Proceedings*, 430 F.

Supp. 3d 516 (N.D. Ill. 2019) (Martin SJ/Daubert Order).  The parties agree that

Minnesota law governs the claims.  Martin's case is scheduled for trial beginning on

August 2, 2021.

In this order, the Court rules on Martin's motion amend a prior ruling, his motion

for sanctions, and certain of the parties' motions *in limine*.  At the final pretrial

conference set for April 26, 2021, the Court will hear argument on the remaining

motions.

**A.      Martin's motion to amend a prior ruling**

Martin asks the Court to amend a prior ruling in which it struck certain opinions

offered by Martin's regulatory expert, Dr. Joshua Sharlin.  The stricken opinions concern

the number of adverse cardiovascular events (MACE events) for TRT drugs logged in

the FDA's adverse event reporting system (the FAERS database) between 2004 and

2011.  The Court denies the motion.

In January 2020, the Court granted Martin's motion to substitute Dr. Sharlin for

Dr. Peggy Pence, a regulatory expert who withdrew from Martin's case for reasons that

are not relevant here.  Consistent with Federal Rule of Civil Procedure 26, Martin

represented that Dr. Sharlin would limit his opinions to the subjects and testimony that

Dr. Pence had offered.  The Court granted Actavis's motion to strike the FAERS-related

2

opinions because they went "significantly beyond" what Dr. Pence disclosed. Actavis Opp. to Mot. to Amend, Ex. A (Feb. 14, 2020 Hr'g. Tr.) [dkt. no. 177-1] at 6:23-7:7. The Court determined that Martin did not show substantial justification for the late disclosure because the FAERS-related information was not new or previously unavailable. *See id.* at 7:8-12 (applying FED. R. CIV. P. 37(c)(1)). The Court also determined that the late disclosure was not harmless "given the proximity to the trial date," which at the time was about two months away. *Id.* at 7:12-13 (applying same).

After the Court issued that ruling, it had to postpone the trial date several times because of the coronavirus pandemic. According to Martin, the parties now have plenty of time to prepare for trial, so Actavis will not be prejudiced if the Court allows Dr. Sharlin to offer the previously stricken testimony. The Court disagrees. First, the fast-approaching trial date was not the primary reason for the Court's ruling. Just as significant was Martin's failure to show that the FAERS-related opinions are based on new or previously unavailable information. That circumstance has not changed.

Second, although the parties now have more time to prepare for trial, amending the ruling would still cause unfair prejudice to Actavis. Relying on the Court's prior order, Actavis took Dr. Sharlin's deposition and filed a motion to exclude his opinions under *Daubert v. Merrell Dow Pharmaceuticals, Inc.* 509 U.S. 579 (1993). If the Court amends its ruling about the permissible scope of Dr. Sharlin's opinions, Actavis will likely need to depose Dr. Sharlin again and, perhaps, file another *Daubert* motion. The fact that Actavis's regulatory expert, Dr. David Feigal, discusses Dr. Sharlin's FAERS opinions in his report does not persuade the Court otherwise. An expert's criticism of the opposing expert's opinions does not necessarily serve the same purpose as the

3

opposing expert's deposition testimony about his own opinions. And it is certainly no substitute for the possibility of excluding an opposing expert's testimony under *Daubert*. In short, amending the prior ruling would create extra work for Actavis and unfairly detract from its trial preparations.

Martin also fails to explain why he waited so long to file his motion. The Court granted Actavis's motion to strike Dr. Sharlin's FAERS-related opinions on February 14, 2020. The parties filed a motion to continue the trial date because of the pandemic (and the Northern District's General Order concerning the pandemic) on March 17, 2020. In July 2020, the Court reset the trial to begin in November 2020. The Court had to reset the trial two more times. Martin could have filed his motion to amend at any point but instead delayed until February 22, 2021. That is reason enough to deny the motion.

Finally, Martin argues that the Court should permit Dr. Sharlin to offer his FAERS-related opinions because Actavis plans to offer evidence about the number of Androderm-related MACE events in its internal pharmacovigilance database during the relevant time. For reasons the Court explains in its ruling on Martin's sixth motion *in limine*, this argument is misplaced. The Court denies Martin's motion to amend.[2]

## B.    Martin's motion for sanctions

Martin has moved to impose sanctions upon Actavis on the ground that its counsel improperly coached Christopher Cassarino—a former Actavis sales representative—during his deposition for this case. The relevant testimony and attorney

---

[2] In the briefing on Martin's motion to amend, both sides allude to a possibility that Dr. Sharlin will offer his FAERS-related opinions at trial in another case that is part of this MDL proceeding (*Davis v. Actavis, Inc.*, No. 17 C 3775). The Court has not decided whether that would be appropriate. The instant ruling applies to Martin's case only.

objections relate to marketing materials and methods for training Actavis sales representatives under a 2006 co-promotion agreement between Actavis and Solvay. As part of the co-promotion agreement, Actavis sales representatives promoted Solvay's TRT drug, AndroGel, to urologists. (Solvay later became AbbVie.) Martin argues that improper coaching from Actavis's counsel caused Cassarino to change his testimony about (among other things) whether Actavis used unbranded disease state awareness materials from Solvay to train its sales representatives. At the same time, Martin says that he eventually obtained truthful testimony from Cassarino.

Cassarino is not going to testify in person at trial. Rather, the parties will play portions of his videotaped deposition for the jury. Martin asks the Court to sanction Actavis by allowing him to play the objections and attorney colloquy that demonstrate witness coaching. That will help the jury understand why Cassarino apparently changed his testimony during his deposition. Martin also asks the Court to prohibit Actavis from playing the testimony that Cassarino changed because of coaching. And Martin asks the Court to impose other, unspecified sanctions.

The Court agrees with Martin that Actavis's attorney improperly coached Cassarino. The following objection from Actavis's attorney is a representative example: "Well, I don't want—your question should not create the false impression for Mr. Cassarino or the jury that [disease state awareness] materials for Androderm were supplied by Solvay to Watson, and your question very much so creates that inaccurate set of circumstances and facts." Martin Mot. for Sanctions, Ex. 1 (Cassarino Dep.) [dkt. no. 172-1] at 74:10-17. This and other similar objections essentially told Cassarino how to respond, and one may fairly infer (and the Court does infer) from the repeated

5

making of similar objections that Actavis's counsel made the objections exactly for this reason. This conduct frustrated the purpose of the deposition. The Court may "impose an appropriate sanction" for impeding, delaying, or frustrating "the fair examination of the deponent." FED. R. CIV. P. 30(d)(2). On the other hand, as noted, Martin states that Cassarino gave truthful answers during re-examination that followed the coaching.

Given Martin's statement that he eventually obtained a truthful answer despite the interference by Actavis's counsel, the Court believes that the following is the appropriate way to deal with counsel's inappropriate conduct. If testimony is designated from the deposition that was given following an inappropriate "speaking" or suggestive objection by Actavis's counsel, the Court will allow Martin to play for the jury the improper objections and colloquy identified in his motion. That is the best way to explain the apparent shift in Cassarino's testimony. Although attorney objections and colloquy are not evidence, the Court routinely instructs juries to that effect and will do so in this situation as well.

The Court notes that it is asking the parties to provide argument at the final pretrial conference on Actavis's sixth motion *in limine*, which requests exclusion of all evidence concerning the 2006 co-promotion agreement. That evidence includes the Cassarino testimony and attorney objections at issue in Martin's motion for sanctions. The Court's ruling on Actavis's sixth motion *in limine* could render moot or alter the scope of its ruling on Martin's motion for sanctions.

**C.      Martin's motions *in limine***

**1.      Martin's alcohol use**

Martin asks the Court to exclude testimony and evidence about his alcohol use,

including his history of alcoholism. According to Martin, he was not drinking alcohol in the two years leading up to his heart attack in May 2013. That makes evidence about his alcohol use minimally relevant and unfairly prejudicial, he contends. Martin equates his case with *Mitchell/Konrad*, *Myers*, and *Holtsclaw*—MDL bellwether trial cases in which the Court excluded evidence of the plaintiffs' alcohol and drug use because its probative value was substantially outweighed by the risk of unfair prejudice. But those cases are distinguishable because the defendants did not show that the evidence was relevant to causation or to the underlying cause of the plaintiffs' hypogonadism. For example, in *Mitchell/Konrad*, AbbVie did not argue that the plaintiff's alcohol use caused his injuries. Rather, AbbVie maintained that the evidence demonstrated his "penchant for taking risks, as well as the likelihood that he lived a sedentary lifestyle." *In re Testosterone Replacement Therapy Prods. Liab. Litig. Coordinated Pretrial Proceedings*, MDL No. 2545, Case No. 14 C 1748, 2017 WL 2313201, at *11 (N.D. Ill. May 29, 2017) (Mitchell/Konrad MIL Rulings); *see also In re Testosterone Replacement Therapy Prods. Liab. Litig. Coordinated Pretrial Proceedings*, MDL No. 2545, Case No. 14 C 1748, 2018 WL 2095701, at *5 (N.D. Ill. May 5, 2018) (Myers MIL Rulings) (similar). And in *Holtsclaw*, Auxilium did not identify any evidence that the plaintiff's brief use of an unrelated prescription drug seven years before his heart attack "could have increased his chances of a heart attack." *In re Testosterone Replacement Therapy Prods. Liab. Litig. Coordinated Pretrial Proceedings*, MDL No. 2545, Case Nos. 14 C 1748, 15 C 3941, 2017 WL 5029601, at *7 (N.D. Ill. Nov. 3, 2017) (Holtsclaw MIL Rulings).

Martin's case is more like *Nolte*, an MDL bellwether trial case where the parties

disputed whether the plaintiff's TRT prescription was for an on-label purpose: treatment of hypogonadism resulting from testicular failure due to toxic damage from alcohol.  *See In re Testosterone Replacement Therapy Prods. Liab. Litig. Coordinated Pretrial Proceedings*, MDL No. 2545, Case No. 14 C 1748, 2018 WL 305503, at *3 (N.D. Ill. Jan. 6, 2018) (Nolte MIL Rulings).  The record contained evidence that the plaintiff's blood testosterone level was in a normal range before he suffered an episode of acute, alcohol-related pancreatitis; the plaintiff continued using alcohol after that incident; and a test conducted several years later showed that the plaintiff's blood testosterone level was below normal.  *See id.*  Based on this evidence, AbbVie's expert opined that it was "not unreasonable to assume that Mr. Nolte may have had toxic damage from alcohol to his testicles due to his extensive drinking history."  *Id.*  The Court determined that "given the significance of the on-label/off-label issue in this case, Dr. Khera's testimony on this point as set forth in his expert report is relevant, and its probative value is not *substantially* outweighed by the danger of unfair prejudice posed by admission of evidence regarding Nolte's alcohol use."  *Id.* at *4.

Like the AndroGel label at issue in *Nolte*, the Androderm label states that the drug is indicated to treat a deficiency or absence of testosterone resulting from testicular failure due to toxic damage from alcohol.  Martin alleges that Actavis marketed Androderm for an off-label purpose (treatment of age-related hypogonadism), so "the underlying cause of [his] hypogonadism is potentially a significant issue." *Id.* at *3. Actavis offers expert opinions that are relevant on this point.  Dr. Bruce Corser, a pulmonologist, considers a detailed history of Martin's alcohol use and opines that "[t]he etiology of [Martin's] acquired hypogonadism is likely related to several factors including

alcoholism . . . ."  Martin MIL, Ex. B (Dr. Corser Report) [dkt. no. 171-2] at 2, 8.  He also

explains how alcohol use can cause hypogonadism.  *See id.* at 8 ("Alcohol use affects

all three parts of the hypothalamic-pituitary-gonadal (HPG) axis, a system of endocrine

glands and hormones involved in male reproduction.  Alcohol use is associated with low

testosterone and altered levels of additional reproductive hormones.").  Dr. Tung-Chin

Hsieh, a urologist, offers a similar opinion.  *See* Martin MIL, Ex. E (Dr. Hsieh Report)

[dkt. no. 171-5] at 10, 11 (noting Martin's "history of alcohol abuse" and explaining that

alcohol use affects the HPG axis).

     Martin argues that his case is distinguishable from *Nolte* because there are no

tests tending to show that alcohol use caused his blood testosterone level to drop.  He

also maintains that his medical records do not show that his alcohol use played any role

in Dr. Firestone's prescribing decision.  These issues affect the weight, not the

admissibility, of Dr. Corser and Dr. Hsieh's opinions.  Both experts link Martin's history

of alcohol use with scientific information about how alcohol use affects testosterone

levels.  On cross-examination, Martin is free to press the experts on how the alleged

evidentiary gaps might affect their opinions or the weight to be given to them.  The

issues Martin identifies, however, do not warrant exclusion of the experts' opinions or

the evidence of alcohol use on which they are based.

     Martin also faults Drs. Corser and Hsieh for allegedly ignoring that he did not use

alcohol for two years before his heart attack.  This criticism, too, affects only the weight

of the opinions.  Dr. Corser appears to acknowledge that Martin did not drink during

those two years.  *See* Dr. Corser Report at 2 (stating that Martin began outpatient

treatment for alcohol use in February 2011 and "relapsed" in March 2014).  Dr. Hsieh

9

states that Martin has a "history of alcohol abuse with long-term changes in his liver (increased iron deposition found on 2015 MRI of liver)." Dr. Hsieh Report at 10. Martin can press the point that the experts do not explain how his alleged two years of sobriety affect their conclusions. But the experts' lack of focus on those two years does not warrant exclusion of their opinions—especially because there is some evidence tending to show that Martin *was* drinking during the two years before his heart attack. *See, e.g.*, Martin MIL, Ex. A (Martin Dep.) [dkt. no. 171-1] at 197:23-198:6 (testifying that around the time of his heart attack, "there was [sic] occasions when I probably drank too much . . . but I wasn't an everyday drinker"). It is up to the jury to decide which timeline of alcohol use they believe and how it affects the weight of the expert opinions on the cause of Martin's hypogonadism.

To summarize, Dr. Corser and Dr. Hsieh's opinions are relevant to the underlying cause of Martin's hypogonadism—which may be a significant issue in the case—and their probative value is not substantially outweighed by the risk of unfair prejudice posed by admission of evidence about Martin's alcohol use. As in *Nolte*, however, the experts' testimony "will be constrained by [their] report[s] and the way [they] characterize[] the evidence there." Nolte MIL Rulings, 2018 WL 305503 at *4. Furthermore, the Court prohibits a third Actavis expert—Dr. Milton Packer—from opining about Martin's history of alcohol use because the cited portion of his report discusses alcohol use only in the abstract. *See* Martin MIL, Ex. F (Dr. Packer Report) [dkt. no. 171-6] at 62 ("Changes in the hypothalamic-pituitary axis as a result of . . . alcohol abuse or addiction can . . . depress the production of testosterone."). Dr. Packer's opinion is also cumulative of those offered by Drs. Corser and Hsieh.

Separately, Actavis offers evidence of Martin's alcohol use for its purported relevance to (1) the cause of his heart attack and (2) his contributory negligence. Dr. Corser states that drinking more alcohol than the American Heart Association Recommends increases the risk of high blood pressure. *See* Dr. Corser Report at 6-7. He then opines that Martin's heavy alcohol use in the years before his heart attack "contributed substantially to his cardiovascular disease and substantially increased his risk for a myocardial infarction." *Id.* He does not opine that Martin's alcohol use caused high blood pressure, however, nor does he otherwise explain how it increased his risk of heart attack. *See id.* In this context, the evidence of Martin's alcohol use has limited probative value and is substantially outweighed by the risk of unfair prejudice. *See, e.g.*, Nolte MIL Rulings, 2018 WL 305503 at *3 (excluding expert testimony that alcohol use was a potential risk factor for the plaintiff's pulmonary embolism where expert "cited no scientific support for that claim"). The Court therefore grants Martin's motion to this extent. The Court also excludes Dr. Packer's opinion that alcoholism is "known to lead to myocardial infarction," Dr. Packer Report at 151-52, because Actavis does not respond to Martin's request to exclude it.

### 2. Martin's tobacco use

Martin moves to exclude evidence and testimony about his tobacco use, arguing that it is far more prejudicial than probative. Actavis's cardiology expert, Dr. Packer, states that a heart attack is "typically the result of coronary atherosclerosis" and that smoking tobacco is one of the "primary causal conditions for the development of coronary atherosclerosis." Dr. Packer Report at 68; *see also id.* at 151 (stating that Martin's history of smoking is a "well-documented condition[] that [is] known to lead to

myocardial infarction" (citing medical journal)). Similarly, Dr. Corser states that "[t]obacco use is a well-established risk factor for CVD incidence and mortality," and that Martin "substantially contributed to his cardiovascular disease and his risk of myocardial infarction by continuing to smoke tobacco products until 2012 . . . ." Dr. Corser Report at 7 (citing medical journals).

Martin's primary criticism of these opinions is that they depend on the assumption that he stopped smoking cigarettes in 2012. According to Martin, he stopped smoking cigarettes in 2002. But like the timeline of his alcohol use, the timeline of his cigarette use is a disputed factual issue. For example, two of Martin's medical records state that he quit smoking cigarettes in 2012. Martin argues that the records are incorrect, but that is an issue for the jury to decide. Moreover, Dr. Packer states that "smoking continues its harmful effects to cause myocardial infarction for up to 20 years after total cessation; the harmful effects of smoking are maintained at high levels for at least 3 years after quitting." Dr. Packer Report at 152. Martin, for his part, admits that he used chewing tobacco in 2012 and 2013. *See* Martin Dep. at 89:5-8. Accordingly, even if a jury credits Martin's contention that he stopped smoking cigarettes in 2002, it could reasonably credit the experts' opinions that his tobacco use was a cause of his heart attack. What Martin characterizes as the experts' reliance on an "incorrect quit date" affects only the weight of their opinions. Martin MIL [dkt. no. 171] at 6.

No more persuasive is Martin's argument that the Court should exclude Dr. Packer's opinion because he does not state that tobacco use was a substantial factor in causing his heart attack. Actavis "does not carry the same burden to establish conclusively that any one factor caused [Martin's] injury, and thus an opinion from one

of its experts that some factor *may* have contributed to the injury could be relevant and admissible."  Nolte MIL Rulings, 2018 WL 305503 at *2.  Dr. Packer and Dr. Corser's opinions about Martin's tobacco use are relevant to the issue of causation, and Martin has not shown that their probative value would be substantially outweighed by the risk of unfair prejudice.  The Court denies Martin's motion to exclude the opinions and the evidence on which they are based.

### 3. Selected objections in deposition clips

Rather than providing in-person testimony at trial, current and former Actavis employees (such as Cassarino) are testifying by videotaped deposition.  Martin asks the Court for permission to play objections that Actavis's attorneys made during the depositions.  According to Martin, the objections show that Actavis coached the witnesses and caused them to alter their testimony.  But Martin cites only the Cassarino deposition as an example, and the Court has resolved Martin's request as it relates to Cassarino.  Without context from the other depositions, the Court cannot rule on Martins' request.  Therefore, it denies Martin's third motion *in limine*.  Martin may re-raise his request on a case-by-case basis at trial.

### 4. Contradictory testimony after alleged coaching of Cassarino

Martin asks the Court to prohibit Actavis from designating testimony that Cassarino gave in response to coaching by Actavis's attorney.  As indicated in its ruling on the motion for sanctions, the Court has determined that if testimony following an improper objection is designated for trial, the Court will allow Martin to play attorney objections and colloquy from the deposition to explain apparent shifts in Cassarino's testimony.  This remedy is sufficient to resolve the motion in limine.

### 5. Number of adverse events logged in FAERS database before 2011

This motion overlaps entirely with Martin's motion to amend the Court's order striking Dr. Sharlin's FAERS-related opinions. The Court denied that motion, so it denies this one as well.

### 6. Actavis's evidence of adverse cardiovascular risk signals

Because the Court has denied Martin's fifth motion *in limine*, Dr. Sharlin will be barred from testifying about the number of MACE events logged in the FAERS database before 2011. That testimony would have been relevant to whether and when Actavis was on notice of a potential cardiovascular risk signal for Androderm. Martin argues that, because he cannot present Dr. Sharlin's FAERS-related testimony, the Court should prohibit Actavis from presenting evidence that it learned of only two MACE events while monitoring Androderm during the relevant time. Relatedly, Martin argues that the Court should prohibit Actavis from arguing that it was not on notice of a potential cardiovascular risk signal for Androderm because it knew of only those two MACE events.

The Court denies Martin's motion. Martin knew about the evidence he seeks to exclude before his previous regulatory expert, Dr. Pence, withdrew from the case. *See* Actavis Opp. to Martin Mot. to Amend [dkt. no. 177] at 7 (explaining that Dr. Pence testified during her deposition in Martin's case about Actavis's count of MACE events). The Court permitted Martin to substitute Dr. Sharlin for Dr. Pence so long as Dr. Sharlin's opinions did not go beyond the opinions Dr. Pence disclosed. Thus to rebut Actavis's contention that it knew of only two Androderm-related MACE events, Dr. Sharlin was restricted to whatever opinions Dr. Pence offered on that score. Dr. Sharlin

significantly exceeded Dr. Pence's opinions with his discussion of the MACE event count in the FAERS database, and the Court struck the discussion. Adding to this, Actavis's regulatory expert (Dr. Feigal) discussed Actavis's MACE event count in his expert report, but Martin did not challenge his opinions under *Daubert*. Martin must live with his strategic choices. He cannot now argue that his purported inability to rebut Actavis's arguments about MACE event counts through Dr. Sharlin is unfair or prejudicial.[3]

It also bears mention that Martin draws an inapt comparison between Actavis's MACE event count and Dr. Sharlin's. As Actavis explains, the two MACE events that Dr. Feigal discusses are Androderm-related and were recorded in Actavis's internal pharmacovigilance database. By contrast, Dr. Sharlin's MACE event count comes from FAERS, which is an FDA database that collects reports from patients using all TRT drugs. Given these differences, it is not unfair or unduly prejudicial to allow Actavis to present evidence about the number of Androderm MACE event reports it allegedly received while barring Martin from presenting evidence about the total number of MACE event reports in the FAERS database.

### 7. Hemochromatosis

Martin moves to exclude evidence that he was evaluated for and has a family history of hemochromatosis, a genetic condition that causes one's body to retain too much iron. Hemochromatosis is a cause of secondary hypogonadism. Martin's genetic testing showed that although he is a carrier of the gene for hemochromatosis, the

---

[3] It is conceivable that Martin may be able to address this point through cross-examination of Actavis's experts. That is outside the scope of the present motion.

disease does not affect him. Actavis admits that its experts do not conclude that hemochromatosis was a cause of Martin's heart attack or of his low-end normal testosterone level. As a result, Martin argues, evidence about hemochromatosis has minimal probative value and poses a substantial risk of confusing or misleading the jury. Actavis responds that the evidence is relevant to show that its experts "did not rely on conditions" that would support Actavis's case "when those conditions were not supported by reliable evidence." Actavis Opp. to Martin MIL [dkt. no. 178] at 11.

Whatever relevance the hemochromatosis evidence might have to Actavis's experts' methodology, it is minimal compared to the potential for the evidence to confuse the jury and waste trial time. *See, e.g.*, Mitchell/Konrad MIL Rulings, 2017 WL 2313201 at *10 (evidence that the plaintiff's father had prostate cancer and his mother had a fatty liver was inadmissible where neither the defendant nor its expert "explain[ed] why that history [was] relevant for assessing the cause of [the plaintiff's] heart attack"). The jury will be able to assess the integrity of Actavis's experts' methodology based on their testimony about the factors they do consider relevant to causation, and about why they believe Martin's causation theories are incorrect. The Court grants Martin's motion to exclude all evidence about hemochromatosis.

### 8. Responsibility for the conduct of predecessor entities

In bellwether trial cases where AbbVie was a defendant, the Court instructed the jury (without objection by AbbVie) that AbbVie is legally responsible for the conduct of its predecessor entities. *See* Case Management Order No. 99 (Mitchell II MIL Rulings), MDL No. 2545, Case No. 14 C 1748, Dkt. No. 2378 ¶ 3(c). The Court also precluded evidence or argument that was inconsistent with that instruction. *See id.* Martin asks

the Court to give a similar instruction here.

Actavis contends that the instruction is unnecessary because, according to Actavis, there were no predecessor entities during the relevant time. Specifically, Actavis states that Defendants Actavis Laboratories UT, Inc. and Actavis Pharma, Inc. are the only entities that manufactured or sold Androderm while Martin was taking the drug. Likewise, Actavis states that while Martin was taking Androderm, Actavis, Inc. was a holding company and the parent company of the other Defendants. According to Actavis, Actavis, Inc. became a "predecessor entity" only after Martin stopped taking Androderm. *See* Actavis Opp. to Martin MIL at 11 (stating that Actavis, Inc. was converted to a limited liability company called Allergan Finance, LLC sometime after April 8, 2013). Because there are no relevant "predecessor entities," Actavis argues, the Court should deny Martin's motion for an instruction concerning predecessor entity liability. At the same time, Actavis admits that Actavis Laboratories UT, Inc. and Actavis Pharma, Inc. were "at one time" named Watson Laboratories, Inc. and Watson Pharma, Inc. *Id.* at 11 n.3. At a minimum, therefore, it would seem that the requested instruction is necessary as it relates to the Watson entities. Actavis is directed to clarify its contrary position at the final pretrial conference.

Actavis also states that it "intend[s] to argue that Actavis, Inc., was a holding company that did not manufacture or sell Androderm and has no liability to Plaintiff." *Id.* at 12. The Court submits that this argument would violate the spirit of the predecessor entity instruction and could confuse the jury. The allocation of liability among the Actavis Defendants is an issue better resolved between the parties and outside the jury's presence. Significantly, Actavis moved for summary judgment on the claims

against Actavis, Inc. on the ground that that entity does not manufacture or sell Androderm. The Court ordered the parties to attempt to reach a stipulation that would resolve the motion. *See* Martin SJ/Daubert Order, 430 F. Supp. 3d at 548. The Court stated that if the parties could not reach an agreement, it would order Actavis to produce a 30(b)(6) witness who could provide relevant testimony, and would then order the parties to file simultaneous supplemental briefs on the issue. *See id*. As far as the Court can tell, the parties neither reached a stipulation nor informed the Court of their failure to do so. At the final pretrial conference, the parties are directed to discuss their efforts to reach a stipulation. They should also be prepared to discuss whether the argument Actavis forecasts will confuse or mislead the jury. Until then, the Court defers ruling on Martin's eighth motion *in limine*.

### 9. Family history unrelated to cardiovascular events

Martin moves to exclude evidence of family medical history unrelated to cardiovascular events. But he does not provide any examples of the evidence he seeks to exclude. (The only exception is evidence about hemochromatosis, which the Court addressed above.) The Court agrees with Actavis that Martin's motion is too vague to enable Actavis (or the Court) to respond meaningfully. Accordingly, the Court denies Martin's motion. If, at trial, Actavis attempts to introduce evidence of family medical history that Martin considers inappropriate, he should object and request a sidebar. The Court will then consider whether Actavis can lay a foundation showing that it is relevant for assessing the cause of Martin's heart attack.

### 10. "Good company" and "good industry" evidence or argument

Martin asks the Court to exclude any evidence or argument about Actavis's

"service to society, other drugs, research, philanthropic work, [or] charitable donations," maintaining that it is improper character evidence. Martin MIL at 13. Actavis responds that it does not intend to introduce evidence about its charitable donations or philanthropic activity. Nonetheless, it argues that the Court should deny Martin's motion because it is overly broad and vague. Actavis also contends that if Martin elicits evidence about alleged bad conduct, it should be able to present rebuttal evidence of good conduct.

The categories of evidence Martin identifies are likely inadmissible character evidence. *See, e.g.*, Martin/Konrad MIL Rulings, 2017 WL 2313201 at *9 (discussing evidence about benefits of other drugs the defendant produces, charitable donations, and philanthropic activity). But it is possible that certain evidence characterized as "good conduct" evidence may be admissible to rebut contentions that Actavis engaged in bad conduct, such as putting profits over people. *See id.* As in other MDL bellwether trial cases, "whether [Martin] open[s] the door to any such 'good conduct' evidence is an issue better left for determination at trial." *Id.* Actavis must, however, raise any such contention outside the jury's presence before attempting to elicit good conduct evidence at trial.

### 11. Martin's residence in Minnesota

Martin asks the Court to bar excessive questioning or argument about the fact that he lives in Minnesota. *See* Myers MIL Rulings, 2018 WL 2095701 at *7 ("Excessive questioning or argument concerning the fact that Myers lives in and was treated in Arizona is barred."). In the alternative, he asks for permission to tell the jury that his case is being tried in Chicago because it was selected as a bellwether trial case in the

MDL proceeding and the parties signed *Lexecon* waivers. Actavis responds that the Court should deny the motion because Martin does not explain what he means by "excessive." It also argues that Martin's proposed explanation for why the case is being tried in Chicago would be unfairly prejudicial because the jury would learn that other plaintiffs have sued Actavis for injuries allegedly caused by Androderm. According to Actavis, it would be especially unfair to tell the jury that the trial location relates to the MDL proceeding because Martin asked to have the case tried in Chicago when he submitted it for consideration as a bellwether case.

Martin's failure to define "excessive" is not a proper reason for denying his motion. Both sides appear to agree that because Martin obtained medical treatment in Minnesota, the jury will learn that he lives there. Beyond this, additional evidence regarding Martin's state of residence is irrelevant and prejudicial, and it is barred, as is any argument on this point. If questioning or argument violates this order, the Court will instruct the jury appropriately. And if Martin wants the Court to explain why the case is proceeding here, the Court proposes that the parties prepare an instruction stating that the case is being tried in Chicago because of an agreement between them.

### 12. Mrs. Martin's absence from the courtroom

Martin's wife, LuAnn Martin, will testify at trial as a fact witness. Actavis intends to ask the Court to exclude her from the courtroom before she has testified under Federal Rule of Evidence 615. Martin asks the Court to permit him to tell the jury why she is absent. Actavis does not object. The Court authorizes Martin to make this point before the jury.

**D.      Actavis's motions *in limine***

**1.      Marketing and promotional materials**

Actavis moves to exclude all evidence of Androderm marketing materials and promotional activities.  That includes: Actavis's internal materials about marketing messaging and strategy; drafts of branded and unbranded marketing materials; internal training materials; promotional or disease awareness materials discussing symptoms that Martin did not have; and materials and communications from Actavis's Promotional Review Committee (PRC), which reviews marketing materials for Actavis drugs to ensure that they comply with the language in the drugs' package inserts.  *See* Actavis MIL [dkt. no. 168] at 4-5.

Actavis states that it expects Martin to present such evidence to support his express warranty and fraudulent misrepresentation claims.  According to Actavis, there is no evidence that Martin or Dr. Firestone saw or relied on Androderm marketing materials.  Actavis also contends that in the summary judgment order, the Court recognized this evidentiary deficit and determined that the express warranty and fraudulent misrepresentation claims "survived based only on statements allegedly made in the Androderm label."  *Id.* at 2.  As a result, Actavis argues, evidence about Androderm marketing materials and promotional activities is irrelevant to the claims, confusing, unfairly prejudicial, and unnecessarily time-consuming.

In addition, Actavis argues that fraudulent misrepresentation is the only claim for which intent is an element.  It maintains that because the Court made no finding that Androderm marketing materials or promotional activities support the claim, its alleged intent in marketing Androderm is irrelevant.  Actavis argues that Martin's case is

therefore distinguishable from other MDL bellwether trial cases in which the Court determined that TRT marketing materials and promotional activity were admissible. *See, e.g.*, Mitchell/Konrad MIL Rulings, 2017 WL 2313201 at *2 ("[E]ven if certain marketing materials played no direct causal role in plaintiffs' use of the drug, those materials may still be relevant on the question of AbbVie's knowledge that its marketing was misleading or its intent to create an off-label market.").[4]

Martin responds that evidence about Androderm marketing and promotion—and specifically, evidence about off-label marketing—"is relevant to every claim" in the case. Martin Opp. to Actavis MIL [dkt. no. 179] at 5. He does not anchor this argument in a discussion of the elements of the claims. Nor does he dispute that there is no evidence confirming that he or Dr. Firestone saw Androderm marketing materials, relied on such materials, or met with Actavis sales representatives. Instead, Martin argues that a reasonable jury could infer from the evidence that it is "highly likely" that each of these things happened. *Id.* at 3. For example, he states that during a deposition for this case, former Actavis sales representative Christopher Cassarino testified that Actavis negotiated with VA hospitals about Androderm's position on their prescription drug formularies. Martin also offers evidence that Actavis placed Androderm advertisements on websites that doctors query for information about TRT drugs. It is true that Martin

---

[4] Actavis also asserts a broader challenge to the Court's determinations about the admissibility of marketing and promotional evidence in those cases. *See* Actavis MIL at 3-4 ("Federal courts across the country have consistently held that marketing materials not relied upon by plaintiffs and their prescribing physicians are to be excluded as irrelevant." (citing cases)). This point is unavailing; the cited cases do not bind this Court and do not persuade the Court that it erred in its earlier rulings. Nor is it clear from Actavis's description of the cases whether the evidence had relevance to the defendants' intent, as this Court determined it did in other MDL bellwether trial cases.

obtained his Androderm prescription at a VA hospital. And it is plausible that Dr. Firestone consulted websites to obtain information about prescription drugs. Martin, therefore, has identified some circumstantial evidence tending to show that Dr. Firestone could have seen Androderm marketing materials.

Actavis correctly observes that the Court discussed only evidence about the Androderm label when it denied its motion for summary judgment on the express warranty and fraudulent misrepresentation claims. *See* Martin SJ/Daubert Order, 430 F. Supp. 3d at 545-47. That said, the Court did not rule out the possibility that other evidence could support those claims. The circumstantial evidence discussed in the previous paragraph may be enough to lay a foundation for consideration of Androderm marketing and promotion evidence for the fraudulent misrepresentation and express warranty claims. But because the connection is tenuous, this determination does not provide a basis to broaden the scope admissible marketing and promotion evidence beyond what the Court discusses below.

Specifically, the Court concludes that a limited amount of evidence about Androderm marketing material and promotional activity, including alleged off-label promotion, is relevant and admissible on Martin's other claims. For example, for design defect claims, Minnesota courts consider whether the manufacturer exercised "'reasonable care' in balancing the likelihood and gravity of harm posed by [the product] 'against the burden of' taking precautions that could prevent it." *Id.* at 544 (quoting *Bilotta v. Kelley Co.*, 346 N.W.2d 616, 621 (Minn. 1984)). In the summary judgment order, the Court explained that Actavis's alleged marketing of Androderm to treat age-related hypogonadism may be relevant to the reasonable care balancing test. *See*

Martin SJ/Daubert Order, 430 F. Supp. 3d at 543-44.

Additionally, although the Court stated that the lack of evidence that Martin or Dr. Firestone saw or relied on Androderm marketing materials was likely fatal to a negligent marketing claim, it did not conclude that it was fatal to Martin's garden-variety negligence claim. *See id.* at 544. Actavis's conduct in marketing Androderm may be relevant to whether it owed Martin a duty of care and breached that duty. *See, e.g.*, *In re Testosterone Replacement Therapy Prods. Liab. Litig. Coordinated Pretrial Proceedings*, MDL No. 2545, Case No. 14 C 1748, 2017 WL 1836443, at *1 (N.D. Ill. May 8, 2017) (CMO 48) (so-called "off-label marketing claims" included negligence claims); *id.* at *15 (the framework that the plaintiff's regulatory expert offered for assessing "what AbbVie intended via its marketing" was relevant to the off-label marketing claims). Finally, the evidence may be relevant to Martin's claim for violation of the MDPTA. And if the Court does not bifurcate the punitive damages proceedings, the evidence may be relevant to punitive damages as well.

As it has in other cases, the Court will limit the amount of marketing and promotion evidence that Martin can present. *See, e.g.*, Nolte MIL Rulings, 2018 WL 305503 at *8 ("[W]hen there is little or no evidence linking the plaintiff or his physician to particular materials, the probative value of all promotional materials is more limited. In such cases, only a limited amount of such evidence may be admissible before the danger for unfair prejudice begins to substantially outweigh the probative value."); Holtsclaw MIL Rulings, 2017 WL 5029601 at *2 (similar). The Court will determine where to draw the line at trial. *See, e.g.*, Nolte MIL Rulings, 2018 WL 305503 at *8. Martin should be advised that he act carefully in deciding which items of evidence to

offer at what point, because at an appropriate point the Rule 403 balance will tip against admission of further evidence.

The Court recognizes that Actavis also challenges specific kinds of marketing and promotion evidence. First, Actavis contends that in *Holtsclaw*, the Court excluded materials "dated years before the plaintiff's TRT use under Rule 403." Actavis MIL at 6 (citing Actavis MIL, Ex. A (Nov. 9, 2017 Holtsclaw Trial Tr.) [dkt. no. 169-1] at 756:14-757:21). Actavis asks the Court to do the same here. Although the Court in *Holtsclaw* indeed excluded training materials from 2002, it indicated that it would allow the plaintiff to present training materials from 2006. *See* Nov. 9, 2017 Holtsclaw Trial Tr. at 757:10-21. The plaintiff's TRT use in *Holtsclaw* occurred in 2013. *See id.* at 757:20. Actavis does not attempt to define in its submission how old is too old, and context matters. Actavis should make specific objections, if any, at trial. To the extent Actavis argues that materials regarding its 2006 co-promotion agreement with Solvay are too old to be relevant, the Court defers ruling until it rules on Actavis's sixth motion *in limine* (which will be after the final pretrial conference).

Actavis also argues that PRC materials are irrelevant because they are internal documents that physicians would never have seen. But internal documents are relevant to Actavis's intent in marketing Androderm and are therefore admissible. The Court encourages the parties to reach an agreement regarding Actavis's concern that certain PRC materials might be covered by attorney-client privilege. Finally, Actavis argues that PRC documents dated after April 8, 2013 (the date of Martin's last Androderm prescription) are irrelevant. The Court explains why that argument lacks merit in its ruling on Actavis's second and third motions *in limine*.

25

## 2. Androderm label changes and regulatory activity after Martin filled his last prescription

Martin filled his last prescription for Androderm on April 8, 2013. Actavis moves to exclude changes to the Androderm label and related regulatory activity that occurred after that date. The evidence that Actavis seeks to exclude includes the FDA's March 3, 2015 announcement that it was requiring all TRT drug manufacturers to add a cardiovascular risk warning (hereinafter, the MACE language) to the Warnings and Precautions section of their TRT drug labels.

In several MDL bellwether trial cases, the defendants sought—and the Court denied—the exact relief Actavis requests here. *See, e.g.*, Mitchell/Konrad MIL Rulings, 2017 WL 2313201 at *1 (denying AbbVie's motion to exclude evidence of changes to the AndroGel label and other regulatory activity that occurred after the plaintiffs stopped using the drug). In *Mitchell/Konrad*, the Court determined that, to the extent the evidence "indicate[d] [the FDA's] views on AndroGel's ability to cause heart attacks," it was "relevant to the issue of causation." *Id.* at *2. The Court also stated that "when considered with evidence of how plaintiffs' prescribing physicians and other physicians changed their prescribing practices in response to those revisions," the 2015 label changes were relevant "on the question of what plaintiffs' prescribing physicians would have done had AndroGel's label been different at the time they prescribed the drug to plaintiffs." *Id.*; *see also* Nolte MIL Rulings, 2018 WL 305503 at *8 (same); Myers MIL Rulings, 2018 WL 2095701 at *2 (denying motion to exclude evidence about post-injury label revisions where prescribing physician testified that, if she had known about the MACE language added to the 2015 label, "she would have discussed this information with [the plaintiff]" in making her prescribing decision).

26

Martin's case is no different. Arguing otherwise, Actavis contends that there is no evidence concerning how label changes and regulatory activity that post-dated Martin's last prescription would have affected Dr. Firestone's prescribing decision. The Court determined at the summary judgment stage that a reasonable jury could disagree. *See* Martin SJ/Daubert Order, 430 F. Supp. 3d at 541 (Martin's medical records and declaration about his doctor-patient relationship with Dr. Firestone "permit[] an inference that Martin would not have wanted to take Androderm if he had known of the undisclosed cardiovascular risk, as well as an inference that Dr. Firestone, knowing Martin's wishes, would not have prescribed the drug"). Given this ruling, Actavis's first argument for exclusion of the evidence lacks merit.

Actavis also argues that the evidence should be excluded because the FDA-mandated 2015 label change is irrelevant to any events that occurred before April or May 2013. In support, Actavis states that "[t]he two studies that caused FDA to issue its first [drug safety communication] on January 31, 2014, had not been published, and the Advisory Committee meeting and recommendations on which FDA based its 2015 actions had not occurred . . . ." Actavis MIL at 10. Actavis also emphasizes that in February 2014, the FDA rejected a request from consumer advocacy group Public Citizen to require TRT manufacturers to strengthen their cardiovascular risk warnings. *Id.* at 9. Finally, Actavis states that, even in September 2014, an FDA Advisory Committee characterized as "weak" the cardiovascular risk signal that had emerged from recent epidemiologic studies of TRT drugs. *Id.*

Again, the Court addressed similar arguments at the summary judgment stage. It determined that, even considering the evidence Actavis cites, a jury reasonably could

conclude that "a causal association between Androderm use and cardiovascular risk was well-supported by the regulatory and scientific evidence" long before Martin was prescribed Androderm.  Martin SJ/Daubert Order, 430 F. Supp. 3d at 539-40.  Likewise, the Court observed that there is "[e]vidence that the FDA recognized a possible link" between TRT use and cardiovascular risk before that time.  *Id.* at 531.  Such evidence "reasonably indicated that the FDA would not have rejected a TRT manufacturer's request to add a cardiovascular risk warning."  *Id.*  For these reasons, evidence of label changes and regulatory activity that post-dated Martin's last Androderm prescription is relevant to the issue of causation.  Its probative value, moreover, is not substantially outweighed by the risk of unfair prejudice or confusion.

Actavis's cited cases do not persuade the Court otherwise.  In *Giles v. Wyeth, Inc.*, 556 F.3d 596 (7th Cir. 2009), the Seventh Circuit determined that the district court was correct to exclude warning labels that post-dated the plaintiff's injury because the warnings "focused on the risk of suicide in younger persons, not adults of [the plaintiff's] age." *Id.* at 598.  Furthermore, there was "no evidence that [the defendant] knew or should have known the information contained in the later warnings at the time of [the plaintiff's] death."  *Id.*  Here, the later warnings were relevant to Martin's demographic group, and there is evidence from which a jury reasonably could find that Actavis was on notice of the relevant information while Martin was taking Androderm.  In Actavis's cited portion of *Chlopek v. Federal Insurance Co.*, 499 F.3d 692, 700 (7th Cir. 2007), the Court determined that evidence about a subsequent remedial measure was properly excluded under Federal Rule of Evidence 407.  Actavis does not bring a Rule 407 challenge to the evidence, and any effort to do so would be unavailing.  *See, e.g.*,

Mitchell/Konrad MIL Rulings, 2017 WL 2313201 at *1 ("Because the FDA required AbbVie to make the 2015 changes to its label, the Court concludes that Rule 407 does not apply.").[5]

Actavis also seeks to exclude evidence that, as part of the 2015 label change, the FDA required a statement that Androderm's safety and efficacy in men with age-related hypogonadism have not been established. According to Actavis, this evidence is irrelevant because Martin's medical records do not show that he was diagnosed with age-related hypogonadism or prescribed Androderm to treat that condition. As Martin argues in response to Actavis's fifth motion *in limine*, however, his medical records can reasonably be understood as showing that Dr. Firestone prescribed him Androderm to address symptoms of aging: fatigue, lack of energy, and declining libido. In particular, Martin asked his nurse if his fatigue could be related to his testosterone level; obtained an Androderm prescription after a test showed his testosterone level was at the low end of a normal range; and continued refilling prescriptions after telling his medical team that Androderm was improving his energy level and libido. The Court concludes that the 2015 label change as it relates to age-related hypogonadism is relevant and admissible. *See, e.g.*, Myers MIL Rulings, 2018 WL 2095701 at *3 (denying motion to exclude subsequent label change concerning age-related hypogonadism where, among other things, the plaintiff's doctor prescribed him AndroGel "to treat symptoms typically associated with aging").

Finally, the parties agree that subsequent label changes and regulatory activity

---

[5] Actavis's other cited cases are not binding on this Court, so the Court does not address them.

concerning the risk of venous thromboembolism (VTE) are irrelevant. Martin is concerned, however, that redacting VTE information from otherwise relevant documents could "make the jury suspicious." Martin Opp. to Actavis MIL [dkt. no. 179] at 10. He proposes "minimiz[ing] the presentation" of VTE information in a way that stops short of redaction, but he does not suggest any methods for doing so. *Id.* As the Court concluded in another MDL bellwether trial case, the "appropriate remedy is redaction of irrelevant material." Nolte MIL Rulings, 2018 WL 305503 at *8.

### 3. Information that allegedly should have caused Actavis to add a MACE warning before April 8, 2013

According to Martin, Actavis could have used the FDA's changes being effected (CBE) procedure to unilaterally add the MACE language to Androderm's label before April 8, 2013—the date of Martin's last Androderm prescription before his heart attack. Actavis moves to exclude evidence of information that purportedly supports this theory "unless and until [Martin] lays a foundation that the information is Newly Acquired Information acquired by [Actavis] after April 26, 2012." Actavis MIL at 13. April 26, 2012 is the date of the last FDA-approved revision to the Androderm label before Martin started taking the drug.

The Court assumes familiarity with its previous discussions of the CBE procedure, including the definition of newly acquired information as it relates to that procedure. *See, e.g.*, Martin SJ/Daubert Order, 430 F. Supp. 3d at 527-31. The theory Actavis advances here is the same one it pressed unsuccessfully in moving for summary judgment that Martin's failure to warn, design defect, and so-called "off-label marketing" claims are preempted by federal law. *See id.* at 529. In denying Actavis's motion for summary judgment, the Court observed that the theory depends on an

assumption that "the FDA's approval of the Androderm label in April 2012 constitutes 'clear evidence' that it would have rejected an attempt by Actavis to add the relevant warnings between 1995 and October 2012 based on the information available during that time." *Id.* at 529-30. The Court explained why that assumption lacks merit, *see id.*, and the same reasoning applies here. Martin is free to present information that he contends supports his causation theory without laying a foundation that Actavis discovered it after April 26, 2012.

Actavis cites *Dolin v. GlaxoSmithKline LLC*, 901 F.3d 803, 815 (7th Cir. 2018) (*Dolin I*) for the proposition that newly acquired information means information obtained after the date of the last FDA-approved revision to a drug label. But the Court in *Dolin* did not articulate this bright-line rule. There, the defendant proposed adding an adult suicidality warning to a prescription drug label in 2007. *See id.* at 810. The FDA rejected the proposal that same year. *See id.* Specifically, it required all manufacturers of the drug "to adopt the same class-wide warnings"—which omitted the product-specific language that the defendant had proposed. *Id.* at 810, 813. It also communicated to the defendant that it was rejecting the product-specific warning language. *See id.* at 810. The Seventh Circuit determined that to show the defendant could have used the CBE process to add the warning between 2007 and 2010, the plaintiff had to offer evidence that the defendant acquired new information after 2007 that justified the previously-rejected warning. *See id.* at 815.

Later, the Seventh Circuit concluded that its decision in *Dolin I* "would have been the same under" *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668 (2019), where the Supreme Court clarified the standard for impossibility preemption. *Dolin v.*

*GlaxoSmithKline LLC*, 951 F.3d 882, 889, 891 (7th Cir. 2020) (*Dolin II*).  That was because the record showed that the defendant "disclosed the relevant data underlying its desired adult-suicidality warning to the FDA in 2006," and "the FDA unambiguously rejected" the defendant's proposed warning in 2007 "when it formally mandated that all SSRIs carry a uniform, class-wide warning label."  *Dolin II*, 951 F.3d at 891.

The dispositive evidence in *Dolin I* and *Dolin II* is lacking here for reasons the Court has already explained.  *See, e.g.*, Martin SJ/Daubert Order, 430 F. Supp. 3d at 531.  Accordingly, the *Dolin* cases do not support Actavis's argument that newly acquired evidence must be evidence obtained after April 26, 2012.  The Court denies Actavis's third motion *in limine*.

### 4.    Defendants' alleged promotion of Androderm for the treatment of age-related hypogonadism

Actavis moves to exclude evidence that it allegedly promoted Androderm to treat age-related hypogonadism, which Martin contends is an off-label use.  According to Actavis, the evidence is irrelevant because the record contains no evidence that Martin's age affected his testosterone level.  Actavis emphasizes that Martin's testosterone level at the relevant time was in the low end of a normal range; his medical records do not show that he was diagnosed with age-related hypogonadism; and he offers no admissible expert testimony regarding the etiology of his testosterone level.  These arguments are unpersuasive because, as discussed above, a jury reasonably could conclude based on the evidence that Martin was prescribed Androderm to treat symptoms of aging.

The Court has also addressed Actavis's other proposed ground for exclusion: that the evidence has no relevance because there is no record of Martin or his

prescribing physician having seen Androderm promotional materials or interacting with Actavis sales representatives. For the reasons explained in connection with Actavis's first motion *in limine*, a limited amount of evidence concerning alleged off-label promotion is relevant to this case. The Court denies Actavis's motion to exclude evidence of alleged promotion of Androderm for treating age-related hypogonadism.

### 5. Unofficial statements by FDA employees

Actavis asks the Court to exclude evidence of unofficial public statements made by former FDA employee Dr. Daniel Shames. It maintains the statements have low probative value because they reflect Dr. Shames's personal opinions rather than the FDA's official views. And because the statements purportedly reflect personal opinions, Actavis contends, they present a danger of confusing and misleading the jury. Finally, Actavis argues that if offered for their truth, the statements are inadmissible hearsay.

In *Mitchell/Konrad*, AbbVie moved to exclude the same evidence for the same reasons. The Court determined that Dr. Shames's statements were relevant to whether AbbVie was on notice that it was marketing AndroGel for off-label purposes. *See* Mitchell/Konrad MIL Rulings, 2017 WL 2313201 at *3. The Court concluded that the probative value of the statements was not substantially outweighed by the risk of unfair prejudice, and it denied AbbVie's motion. *Id.* Martin, too, offers Dr. Shames's statements "to show that Actavis was on notice that its marketing efforts were off-label." Martin Opp. to Actavis MIL at 14. Because the Court has determined that some evidence of Actavis's alleged off-label promotion is admissible in Martin's case, so, too, is evidence that Actavis was on notice regarding the same. Accordingly, the Court denies Actavis's motion.

### 6. AndroGel co-promotion agreement

Actavis asks the Court to exclude all evidence about its September 2006 agreement with Solvay Pharmaceuticals, Inc. to co-promote Solvay's TRT product, AndroGel. The Court directs the parties to provide argument on this motion at the final pretrial conference. Among other things, the parties should be prepared to discuss whether a reasonable solution might be to permit evidence about the co-promotion agreement so long as it is dated 2012 or later. The Court's understanding is that before 2012, Actavis promoted only AndroGel under the co-promotion agreement. After Actavis introduced 2mg and 4mg Androderm patches in 2012, it began promoting both AndroGel and Androderm under the agreement.

### 7. Alleged fraud on the FDA and why the FDA acted or failed to act

Actavis moves to exclude evidence concerning alleged fraud on the FDA, as well as evidence or argument that the FDA would have acted differently on the basis of different information. The Court grants the motion for the reasons stated in numerous orders entered in this MDL proceeding. *See, e.g.*, CMO 48, 2017 WL 1836443 at *7 (fraud-on-FDA claims are preempted); *id.* at *16 (regulatory expert lacks sufficient basis to testify "regarding the FDA's reasons for acting or failing to act"); *see also* Mitchell/Konrad MIL Ruling, 2017 WL 2313201 at *1, *4 (citing same).

Martin argues that Dr. Sharlin should be able testify that, "had Actavis provided the required information and analysis to the FDA, the agency could have taken the action sooner." Martin Opp. to Actavis MIL at 21. The Court already granted Actavis's *Daubert* motion to exclude a nearly identical opinion, explaining that it amounts to an opinion about the FDA's intent. *See In re Testosterone Replacement Therapy Prods.*

*Liab. Litig. Coordinated Pretrial Proceedings*, MDL No. 2545, Case Nos. 14 C 1748, 15 C 4292, 2020 WL 4437829, at *6 (N.D. Ill. Aug. 2, 2020) (Dr. Sharlin Daubert Order) (Dr. Sharlin's opinion that the "FDA otherwise could have identified the risk earlier and initiated a labeling change before March 2015" is inadmissible). Martin identifies no viable reason to change that ruling.

Martin also contends that Dr. Sharlin should be able to explain why the FDA denied the 2014 Public Citizen Petition. According to Dr. Sharlin, the FDA denied the petition because it did not have enough time to respond to it and did not want to interfere with an upcoming Advisory Committee meeting. *See* Martin Opp. to Actavis MIL at 22. Again, the Court has already granted Actavis's *Daubert* motion to exclude Dr. Sharlin's opinions about the FDA's intent in denying the petition. *See* Dr. Sharlin Daubert Order, 2020 WL 4437829 at *6-7; *see also id.* at *7 (barring Dr. Sharlin from opining that the FDA is under-resourced because, unlike other regulatory experts in this MDL proceeding, he cited no foundation for the opinion). Martin's contention that Dr. Sharlin "ties in the actual text of the rejection letter with his theory" does not persuade the Court to change its prior ruling. Martin Opp. to Actavis MIL at 23. Nor does Martin's argument that Dr. Sharlin's opinions may be necessary to rebut Actavis's arguments about why the FDA denied the petition. *See id.* at 22 (predicting that Actavis will suggest that the FDA denied the petition because there was insufficient evidence of a causal relationship between TRT use and cardiovascular risk). Martin's concern is unfounded because the prohibition on offering opinions about why the FDA acted or failed to act applies equally to Actavis.

### 8.    Foreign regulatory actions and labeling

Actavis moves to exclude any evidence or argument about foreign regulatory actions, communications, or labeling related to Androderm.  In *Mitchell/Konrad*, the Court explained that generally speaking, "foreign labeling or regulatory actions have little relevance on the question of whether a defendant's U.S. label is adequate."  *See* Mitchell/Konrad MIL Rulings, 2017 WL 2313201 at *3.  It added that presenting such evidence to the jury could cause confusion and waste time.  *See id.*  But the Court allowed the plaintiffs to offer evidence about a specific Canadian regulatory action regarding AndroGel.  *See id.*  According to the plaintiffs, AbbVie's communications with the Canadian agency about that regulatory action showed AbbVie's knowledge that "hypogonadism could be separated into different categories with different corresponding indications."  *Id.*  The Court determined that the evidence was relevant to "whether AbbVie knew that it was engaging in off-label marketing."  *Id.*  The Court also determined that understanding the evidence would not "require extensive understanding of Canadian regulatory procedure."  *Id.*  In that context, the Court concluded, the probative value of the evidence was not substantially outweighed by the danger of misleading the jury or unfairly prejudicing AbbVie.  *See id.*

Citing *Mitchell/Konrad*, Martin argues that the Court should allow him to introduce evidence about a communication from Health Canada to Actavis in 2006.  According to Martin, the Canadian regulator told Actavis "to stop marketing Androderm for age-related declines in testosterone because there was not proper clinical data supporting" the drug's safety and efficacy for that purpose.  Martin Opp. to Actavis MIL at 24; *see also id.* (maintaining that the evidence is relevant to whether Actavis had notice that the

safety and efficacy of Androderm for aging men—the population Actavis allegedly was "targeting"—had not been proven).  Martin states that he does not intend to offer any other evidence about foreign regulatory actions.

The Health Canada communication that Martin seeks to introduce at trial appears related to the Canadian regulatory communications that the Court concluded were admissible in *Mitchell/Konrad*.  Both occurred in 2006 and expressed concern about suggestions in TRT drug labels that the drugs were indicated to treat "andropause." *Compare* Martin Opp. to Actavis MIL, Ex. 19 (July 2006 Health Canada Ltr. re: Androderm) [dkt. no. 180-8][6] *with* PSC Opp. to AbbVie MIL, Ex. 19 [Case No. 14 C 1748, dkt. no. 1941-11] (Minutes of Feb. 2006 Meeting Between Solvay and Health Canada).  Moreover, Actavis does not address the 2006 Health Canada Letter in its motion *in limine* despite that (according to Martin) he told Actavis in a meet-and-confer that he intended to present it at trial.  *See* Martin Opp. to Actavis MIL at 23-24.  For the same reasons stated in *Mitchell/Konrad*, the Court concludes that the 2006 Health Canada Letter is admissible.  The Court grants Actavis's motion to exclude all other evidence of foreign regulatory actions.

### 9.    Communications with other TRT drug manufacturers

Actavis moves to exclude evidence about the FDA's communications with other TRT drug manufacturers about their TRT drugs.  Actavis provides only one example:  a March 24, 2010 letter from the FDA to Slate Pharmaceuticals about certain promotional materials for its TRT drug, Testopel.  In the letter, the FDA informed Slate that the

---

[6] The July 2006 Health Canada Letter is addressed to "Pharmascience Inc.," not Actavis, but it discusses Androderm.

materials misleadingly implied that Testopel could be used to (1) treat symptoms of depression, erectile dysfunction, type 2 diabetes, HIV, mood disorders, and loss in sexual interest, and (2) increase muscle mass and bone strength. The FDA stated that it was unaware of any data supporting such claims. Actavis argues that the letter is irrelevant because the FDA-approved Androderm label in effect at the time "cited and summarized data from trials of Androderm" that showed the drug improved fatigue, mood, and sexual function. Actavis MIL at 24 (citing Actavis MIL, Ex. G (Androderm Label rev. Nov. 2005) [dkt. no. 169-7]). Actavis maintains that the Slate letter would mislead and prejudice the jury by suggesting there was no data to support the relevant symptom claims in the Androderm label. In addition, Actavis contends that introducing the letter would waste time.

In *Mitchell/Konrad*, the Court granted in part AbbVie's motion to exclude evidence regarding other manufacturers of TRT drugs. The Court explained that other TRT drugs "have different marketing and regulatory histories, and thus testimony or other evidence about those products may be misleading unless it is placed in the proper context." Mitchell/Konrad MIL Rulings, 2017 WL 2313201 at *3. Establishing the proper context would take an undue amount of time, the Court determined. *See id.* It would also be unfairly prejudicial to AbbVie because, through discovery with other defendants in the MDL, the plaintiffs had access "to information about other TRT manufacturers that AbbVie lack[ed]." *Id.* But the Court made an exception for the same FDA letter to Slate that is at issue here. *See id.* The plaintiffs in *Mitchell/Konrad* argued that Slate's "alleged improper marketing was parallel to AbbVie's marketing and that AbbVie received a copy of the letter soon after Slate did, thus giving AbbVie notice that its own

off-label marketing was inappropriate." *Id*. The Court determined that a jury would be able to understand the letter introduced for that purpose "without the need for extended background on Slate's TRT drug." *Id.* Therefore, the Court concluded that the letter was admissible. *Id.*

Martin argues that the letter put Slate's competitors—including Actavis—on notice that they could not promote TRT drugs for improving mood, depression, libido, and erectile dysfunction. He emphasizes that Actavis knew about and relied on the Slate letter when drafting Androderm marketing materials in 2011. Specifically, an Actavis employee cited the letter in an August 2011 internal document for the proposition that "[l]inking Androderm to treatment of osteoporosis, depression, and ED seems overreaching and risky." Martin Opp. to Actavis MIL, Ex. 20 [dkt. no. 180-9] at WLI-MDL2545-00753379. This document tends to show that, like AbbVie, Actavis received a copy of the Slate letter long ago and independent of this MDL proceeding. *See* Mitchell/Konrad MIL Rulings, 2017 WL 2313201 at *3. The document also tends to show that Actavis thought the Slate letter was relevant to its Androderm marketing activities in 2011. This point significantly weakens Actavis main argument for exclusion: that, unlike the Slate promotional materials addressed in the letter, a 2005 version of the Androderm label cited data that purportedly supported the relevant symptom relief claims. Whatever the data in the 2005 Androderm label, the internal document Martin cites can be understood as recognition by Actavis in 2011 that the Slate letter should guide its Androderm promotional activities.

Two other factors further diminish the significance of the 2005 Androderm label to Actavis's request to exclude the Slate letter. First, Martin contends that Actavis did

not repeat the study that allegedly provided supporting data for the sexual side effect claims in the 2005 label.  Second, according to Martin, the FDA required Actavis to remove the sexual side effect claims from the next label revision, which occurred in 2011.

The FDA's March 24, 2010 letter to Slate is relevant to the question whether Actavis had notice that it could not properly market Androderm for improving mood, depression, libido, and erectile dysfunction.  The letter's probative value is not substantially outweighed by the risk of misleading the jury, prejudicing Actavis, or wasting trial time.  The Court grants Actavis's motion to exclude all evidence of communications with other manufacturers of TRT drugs, except for the FDA's March 24, 2010 letter to Slate.

### 10. Total number of lawsuits

Actavis asks the Court to prohibit Martin from introducing evidence about the number of Androderm-related lawsuits filed against it and the number of lawsuits filed against all TRT manufacturers in the MDL.  Actavis appears to contend that it would not open the door to this evidence by asking Martin's medical expert, Dr. Ardehali, about his compensation.  *See* Actavis MIL at 25 n.15.  In previous bellwether trial cases, the Court determined that the defendants could ask the plaintiffs' experts about their hourly compensation rates without opening the door.  *See, e.g.*, Nov. 8, 2017 Holtsclaw Trial Tr. at 564:9-14.  But the Court warned that if the defendants elicited testimony about the experts' overall compensation, it would permit the plaintiffs to introduce evidence about the total number of lawsuits to "explain[] the overall number."  *Id.* at 564:15-19.  The Court will apply the same principles in Martin's trial, but it urges the parties to confer and

agree on a solution in advance.

In response to Actavis's motion, Martin argues that Actavis could open the door to evidence about other cases in the MDL not only by asking experts about total compensation, but also by suggesting that Dr. Ardehali "finds causation in every case he reviews." Martin Opp. to Actavis MIL at 26. Martin contends that the Court should allow him to rebut such an argument with evidence about how Dr. Ardehali approached other cases he reviewed. Ruling on Martin's request would be premature, but the Court warns Actavis that it may be difficult to get into this area without opening a door in some way. The Court also advises that asking Dr. Ardehali about his findings "as a paid expert in litigation" and in specific cases other that Martin's could indeed open the door to evidence about other cases in the MDL. *See* Nov. 8, 2017 Holtsclaw Trial Tr. at 561:10-567:25. Again, the Court urges the parties to confer and agree on a solution before trial.

Martin also maintains that if Actavis "portray[s] [him] as an outlier whose heart attack cannot be blamed on Androderm," the Court should allow him to present evidence that other Androderm patients have sued Actavis for heart attacks allegedly caused by the drug. Martin Opp. to Actavis MIL at 26. Ruling on this request in the abstract would be improper, but the Court encourages both sides to tailor their presentations, wherever possible, to Martin's individual circumstances.

### 11. Inflammatory language

Actavis moves to exclude any evidence or argument that it promoted and sold Androderm "to a population of patients who were participants in 'a mass uncontrolled experiment.'" Actavis MIL at 26. In another MDL bellwether trial case, the Court

41

permitted the plaintiff's regulatory expert to compare defendant Auxilium's marketing practices for its TRT drug to a "mass, uncontrolled experiment." Holtsclaw MIL Rulings, 2017 WL 5029601 at *4 (internal quotation marks omitted) (determining that the comparison was "not so inflammatory or prejudicial to warrant exclusion"). Actavis advocates a different result here because it contends that, unlike in *Holtsclaw*, none of Martin's experts disclosed such an opinion about Actavis's marketing practices.

Martin admits that his regulatory expert, Dr. Sharlin, did not use the phrase "mass uncontrolled experiment" in his report or deposition testimony. But he argues that the Court should allow Dr. Sharlin to use that phrase (or similar language) because he disclosed opinions that Actavis marketed Androderm for uses that have not been proven safe and effective in controlled clinical trials. The Court agrees and denies Actavis's motion.

### 12. Androderm sales figures

Actavis moves to exclude evidence of Androderm sales figures. In *Holtsclaw*, the Court permitted the plaintiff to introduce evidence about the profits that defendant Auxilium earned from sales of its TRT drug, Testim. *See* Holtsclaw MIL Rulings, 2017 WL 5029601 at *2. The Court determined that the evidence was relevant on the issue of Auxilium's alleged motive to market Testim for off-label purposes. *See id.* On the other hand, the Court excluded evidence of sales figures for Testim because it could be misleading without context, such as what it costs Auxilium to produce the drug. *See id.* Later, in *Nolte*, the Court allowed the plaintiff to introduce sales figures for AndroGel. *See* Nolte MIL Rulings, 2018 WL 305503 at *9 (evidence was relevant to AbbVie's alleged motive to promote AndroGel off-label, and its probative value was not

substantially outweighed by danger of unfair prejudice). The Court permitted the plaintiff to offer sales figures—rather than profits figures—because specific data about profits derived from AndroGel sales was unavailable. *See id.*

Actavis contends that the Court should depart from these rulings because its alleged motive to promote Androderm for an off-label purpose—to treat age-related hypogonadism—is irrelevant to every claim in Martin's case. In support, Actavis reiterates that the record contains no direct evidence that Martin or Dr. Firestone saw or relied upon Androderm marketing materials. As already discussed, the Court has concluded that Actavis's alleged off-label promotion and its motive for the same are relevant even in the absence of such evidence. Actavis also repeats its contention that there is no evidence that Dr. Firestone diagnosed Martin with age-related hypogonadism or that Martin took Androderm to treat that condition. The Court explained above, however, that Martin's medical records can be understood as suggesting otherwise. For these reasons, Actavis's cited cases—where intent was irrelevant to all claims and profits figures were untethered to the evidence—provide no assistance.

The Court's rulings in *Holtsclaw* and *Nolte* about the admissibility of sales and profit figures apply equally here. Actavis, moreover, does not suggest that it would be feasible for Martin to offer profit figures in lieu of sales figures. Accordingly, the Court denies Actavis's motion to exclude evidence about Androderm sales figures.

### 13. Testimony about what Martin would have done had he known of MACE risk

Actavis moves to exclude Martin's testimony that he would not have taken Androderm if, at the time of his first prescription, he had known about the MACE

language eventually added to the 2015 label. Martin provided testimony along these lines in a declaration he submitted at the summary judgment stage. Actavis contends that the testimony is "pure speculation." Actavis MIL at 28 (citing FED. R. EVID. 602 (fact witness testimony must be based on personal knowledge); *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 460 (7th Cir. 2014) ("Personal knowledge can include reasonable inferences, but it does not include speculating . . . or other intuitions, hunches, or rumors.")). In *Widmar*, the plaintiff ran afoul of Rule 602 by making guesses about his "employer's state of mind." *See* 772 F.3d at 461. By contrast, Martin invokes his personal experience to testify about what he would have done with different risk information. His testimony is not improper speculation.

Actavis also argues that Martin's testimony is irrelevant because of the learned intermediary doctrine, which provides that a manufacturer's duty to warn about a drug's risks runs to the physician, not the patient. Minnesota courts follow the learned intermediary doctrine. To prove causation, therefore, "Martin must show that (1) Actavis failed to adequately warn" Dr. Firestone "about cardiovascular risk associated with Androderm, and (2) Dr. Firestone would not have prescribed Androderm for Martin if Actavis had provided an adequate warning." Martin SJ/Daubert Order, 430 F. Supp. 3d at 540. Actavis maintains that because of the learned intermediary doctrine, a patient's preferences or conversations with his doctor play no causal role in the doctor's prescribing physician. *See, e.g.*, Actavis MIL Opp. at 28-29 (arguing that if Dr. Firestone had received the MACE language, he would have "already . . . made" his prescribing decision before discussing Androderm's risks and benefits with Martin).

Actavis's theory finds no support in the law. The learned intermediary doctrine

governs only the manufacturer's duty to warn. It says nothing about how physicians make their prescribing decisions. *Mulder v. Parke Davis & Co.*, 181 N.W.2d 882, 885, 288 Minn. 332, 335 (1970), cited by Actavis, does not provide otherwise. *See id.* (manufacturer not liable for doctor's failure to communicate warning to patient, so long as "doctor was fully aware of the facts which were the subject of the warning"). Nor does *Bruzer v. Danek Med., Inc.*, No. CIV. 3-95-971/RHKJMM, 1999 WL 613329, at *6 (D. Minn. Mar. 8, 1999), where the "fatal problem" with the plaintiffs' claims was their doctor's testimony that "he would have recommended [the medical device] regardless of the existence or content of any warnings provided by the Defendants." Dr. Firestone provided no such testimony here. Finally, this Court has previously credited the theory that a doctor's conversation with his or her patient can affect the prescribing physician. *See* Martin SJ/Daubert Order, 430 F. Supp. 3d at 541 (denying Actavis's motion for summary judgment on Martin's failure to warn claim because the evidence "permits an inference that Martin would not have wanted to take Androderm if he had known of the undisclosed cardiovascular risk, as well as an inference that Dr. Firestone, knowing Martin's wishes, would not have prescribed the drug"); Myers MIL Rulings, 2018 WL 2095701 at *2 (evidence of post-injury label change was relevant where prescribing physician testified that, had she known about the MACE language added to the 2015 label, "she would have discussed this information with [the plaintiff]" in making her prescribing decision).

The Court denies Actavis's motion.

### 14.    Dr. Firestone's habits

In the declaration Martin provided for summary judgment purposes, he discussed

Dr. Firestone's practices in the nearly seven years he served as Martin's prescribing physician. *See* Martin SJ/Daubert Order, 430 F. Supp. 3d at 541. The Court cited the declaration as among the evidence permitting a reasonable inference that, had Actavis provided an adequate cardiovascular risk warning to Dr. Firestone, he would have made a different prescribing decision. *See id.* The Court considered and overruled Actavis's objection that Martin's statements about Dr. Firestone's practices are inadmissible evidence of habit under Federal Rule of Evidence 406. *See id.* at 541-42 (determining that Martin's declaration supplies the foundation for habit evidence that Rule 406 requires). Actavis now moves to exclude the same evidence under Rule 406. It presents the same arguments and case law as it did as the summary judgment stage. The Court reaffirms its ruling that testimony consistent with Martin's declaration is admissible under Rule 406.

Actavis also contends that the habit evidence is irrelevant and unfairly prejudicial, and it asks the Court to exclude the evidence under Federal Rules of Evidence 402 and 403. Actavis again repeats unsuccessful arguments from its summary judgment motion. First, it maintains that Dr. Firestone's habits are irrelevant because Martin spoke only with Nurse Hopkins about his Androderm prescription. The Court has determined, however, that the evidence permits a reasonable inference that "Dr. Firestone was actively involved in Martin's treatment with Androderm." Martin SJ/Daubert Order, 430 F. Supp. 3d at 541; *see also id.* at 542 (although Martin may not have spoken directly to Dr. Firestone about Androderm, evidence about Dr. Firestone's habits is admissible because a jury reasonably could conclude that "Martin was communicating with Dr. Firestone through Ms. Hopkins").

Second, Actavis maintains that the relevance and probative value of the habit evidence depends on the unsupported inference that Dr. Firestone read the Androderm label before prescribing the drug to Martin. *See* Actavis MIL at 31 (stating that an alleged omission in a label cannot proximately cause a plaintiff's injury if the doctor prescribed the drug without reading the label (citing cases)); *id.* at 32 (citing *Broesch v. Gagnon*, 817 F.2d 37, 38 (7th Cir. 1987) (State must prove "predicate facts" in order for jury to draw a permissive inference) (internal quotation marks omitted)). Actavis's argument is unavailing because the Court has determined that, based on Martin's medical records, a jury reasonably could infer that Dr. Firestone read the Androderm label before he made his prescribing decision. *See* Martin SJ/Daubert Order, 430 F. Supp. 3d at 540. Finally, Actavis contends that a jury could not reasonably conclude based on the evidence about Dr. Firestone's habits that different cardiovascular risk information would have caused him to make a different prescribing decision. As referenced above, the Court disagrees. *See, e.g.*, *id.* at 541.

The evidence about Dr. Firestone's habits is admissible under Rule 406 and is relevant to causation. Furthermore, its probative value is not substantially outweighed by the danger of prejudice, confusion, or misleading the jury. The Court denies Actavis's motion to exclude it.

### 15. Actavis's financial condition

Actavis moves to exclude "from the compensatory damages proceeding" evidence about its financial condition and evidence relevant only to punitive damages. Actavis MIL at 33. This request is interrelated with Actavis's motion for bifurcation of the punitive damages stage of Martin's trial [dkt. no. 211]. Martin does not oppose the

motion to bifurcate. *See* Martin Resp. to Mot. to Bifurcate [dkt. no. 244] at 1. And he agrees that, if the Court grants the motion, evidence about Actavis's financial condition should be admitted only during the punitive damages stage. But Martin asks the Court to prohibit Actavis from using bifurcation to keep evidence about off-label promotion out of the compensatory damages stage of the trial. He also asks the Court to allow him to enter evidence about Actavis's financial condition through an expert rather than by stipulation about Actavis's net worth.

As discussed above, marketing and promotion evidence may be relevant to several claims in this case—including, but not limited to, Martin's claim for punitive damages. Accordingly, if the Court grants the motion to bifurcate, it will not preclude Martin from introducing a limited amount of evidence about off-label marketing of Androderm during liability phase, as discussed earlier. And so long as the punitive damages proceeding is bifurcated, the Court will grant Actavis's motion to exclude evidence about its financial condition from the compensatory damages stage.

The Court requests argument regarding Martin's request to offer evidence about Actavis's financial condition through an expert. Martin should be aware, however, that because the Court has required the parties to enter the evidence via stipulation in other MDL bellwether trials, it is hesitant to change course here. The parties should also be prepared to discuss (1) whether Minnesota's rule concerning bifurcation is substantive or procedural, and (2) if the rule is procedural, why the Court should bifurcate Martin's trial when it did not do so for the other MDL bellwether trials.

MATTHEW F. KENNELLY
United States District Judge

Date: April 25, 2021